57 Cal.Rptr.3d 781 (2007)
149 Cal.App.4th 1218
CORAL CONSTRUCTION, INC., Plaintiff and Respondent,
v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.
Schram Construction, Inc., Plaintiff and Respondent,
v.
City and County of San Francisco et al., Defendants and Appellants.
No. A107803.
Court of Appeal of California, First District, Division Four.
April 18, 2007.
*783 Dennis J. Herrera, City Attorney, Wayne K. Snodgrass, Sherri Sokeland Kaiser, James M. Emery, Deputy City Attorneys, Moscone, Emblidge & Quadra LLP, G. Scott Emblidge, Rachel J. Sater, San Francisco, Meyers, Nave, Riback, Silver & Wilson, Mara E. Rosales, Joseph M. Quinn, San Francisco, K. Scott Dickey, for Appellants.
Bingham McCutchen LLP, Michael Isaku Begert, Sujal J. Shah, Rianne E. Nolan, Renee M. DuPree, Nancy M. Wang, Elizabeth M. Hall, San Francisco, Lawyers' Committee for Civil Rights, Oren Sellstrom, Woodland, for Amicus Curiae on Behalf of Appellants.
Pacific Legal Foundation, John H. Findley, Sharon L. Browne, Paul J. Beard II, Sacramento, Counsel for Respondents.
*782 REARDON, Acting P.J.
Since 1984, the City and County of San Francisco has operated under various iterations of its Minority/Women/Local Business Utilization Ordinance (Ordinance). The Ordinance, in its several forms, has called for race- and gender-conscious remedies to ameliorate the effects of past discrimination in the awarding of City contracts.
More than 10 years ago the California electorate adopted Proposition 209, the California Civil Rights Initiative, thereby adding article I, section 31 (§ 31) to our Constitution. This amendment prohibits all state and local governments and entities from discriminating against, or granting preferential treatment to, "any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (§ 31, subd. (a).) This appeal centers on the prohibition against distribution of race- and gender-based preferences in public contracting.
Subsequent to the adoption of section 31, the City enacted another version of the Ordinance. Two construction companies[1] challenged the Ordinance on grounds that certain provisions patently violated section 31.
On cross-motions for summary judgment, the trial court struck down the Ordinance as violative of section 31 and rejected the City's arguments that (1) section 31 is preempted by the International Convention on the Elimination of All Forms of Racial Discrimination (Race Convention), a human rights treaty ratified by Congress in 1994; (2) section 31 offends the Hunter/Seattle[2] political restructuring arm of equal protection jurisprudence; and (3) pervasive past discrimination in public contracting *784 converts the Ordinance into a remedial measure required by the federal equal protection clause such that the superior mandate of that clause preempts section 31. The City has appealed.
We conclude that the trial court correctly determined that section 31(1) is not preempted by the Race Convention and (2) does not offend the Hunter/Seattle restructuring arm of equal protection jurisprudence. We further hold that the Ordinance is not required to maintain the City's eligibility for federal funds. However, the trial court failed to adjudicate the matter of whether the Ordinance is mandated by the federal Constitution as a narrowly tailored remedial program to remedy ongoing, pervasive discrimination in public contracting. Accordingly, we will remand the matter to the trial court for the limited purpose of adjudicating this issue. In all other respects, the judgment is affirmed.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. History of the Ordinance

1. 1984 and 1989 Ordinances

In Associated Gen. Contractors of Cal. v. Coalition (9th Cir.1991) 950 F.2d 1401 (AGCC ID), involving a challenge to the 1989 Ordinance, the reviewing court summarized the early history of the Ordinance, as follows:
"In April 1984, the San Francisco Board of Supervisors (the `Board') passed the Minority/Women/Local Business Utilization Ordinance ..., which required the City to set aside designated percentages of its contracting dollars to minority-owned business enterprises [MBE's] and women-owned business enterprises [WBE's]. In addition, the 1984 Ordinance required that MBEs, WBEs and locall[y]-owned business enterprises (`LBEs') receive a five percent bidding preference to be taken into account when the City calculated the low bid on city contracts.
"AGCC, an organization of contractors engaged in the building and construction industry, ... challenged the implementation of the 1984 Ordinance in court. In reviewing the ordinance, this circuit upheld the provisions favoring WBEs and LBEs against AGCC's constitutional challenge but invalidated the provisions favoring MBEs. AGCC v. City and County of San Francisco, 813 F.2d 922, 928-44 (9th Cir. 1987), petition dismissed, 493 U.S. 928, [110 S.Ct. 296, 107 L.Ed.2d 276] (1989) (AGCC I). In addition, we ruled that all bidding preferences, insofar as they applied to contracts over $50,000, violated [the] San Francisco City Charter....
"Shortly after our decision in AGCC I, the Supreme Court considered a similar minority set-aside plan in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 [Croson] [citations] (1989). In that decision, a deeply divided Supreme Court struck down the racial set-aside plan adopted by the city of Richmond, Virginia. At the same time, however, the Court confirmed that municipalities could employ race-conscious remedies to redress discrimination in certain circumstances. [Citations.] Prior to Croson, the City had been investigating continued discrimination in city contracting. In that capacity, it had received, among other information, testimony from 42 witnesses, and written submittals from 127 minority, women, local, and other business representatives. Subsequently, in an attempt to determine whether Croson's criteria for permitting race-conscious ordinances were met with respect to San Francisco, the City held an additional ten public hearings, commissioned two statistical studies, and sought written submissions from the public. Out of this process *785 emerged the 1989 Ordinance...." (AGCC II, supra, 950 F.2d at pp. 1403-1404, fn. omitted.)
The summary continued: "Rather than providing the set-asides mandated by the 1984 Ordinance, the 1989 Ordinance gives bid preferences to prime contractors who are members of groups found disadvantaged by previous bidding practices." (AGCC II, supra, 950 F.2d at p. 1404.) AGCC contested the 1989 Ordinance as well, arguing that it violated the federal equal protection clause and failed to satisfy the Croson standards for race-conscious remedies. The Ninth Circuit concluded that the City was "likely to demonstrate a 'strong basis in evidence' supporting its decision to adopt a race-conscious plan" (id. at p. 1416, fn. omitted) and that the Ordinance was narrowly tailored to redress the consequences of discrimination (id. at pp. 1416-1418).

2. 1998 Ordinance

The 1989 Ordinance expired on October 31, 1998. In the interim period the City's Board of Supervisors (Board) and the City's Human Rights Commission (HRC) conducted further investigations to determine whether discrimination in contracting had been eradicated or mitigated. This effort included 14 public hearings (eight of which occurred in 1997 and 1998), live testimony from 254 witnesses, videotaped testimony from numerous other witnesses, statistical disparity studies and other documentary evidence pertinent to alleged discrimination and bidding irregularities.
Minority contractors observed that, as compared with nonminority contractors, City inspectors imposed more onerous requirements on them, scrutinized their work more closely and treated them more harshly if they made mistakes. For example, while inspectors would waive compliance with certain requirements for majority-owned firms, they forced minority contractors to redo the same work on the same programs, at substantial cost. As well, one minority contractor spoke of being harassed and subjected to racist and derogatory remarks from City inspectors. Another complained of being subjected to more rigorous background-vetting despite his extensive qualifications and experience.
Upon review of all the materials, the Board made findings of continued discrimination in public contracting and subcontracting against minority- and women-owned businesses, concluding that a new MBE/WBE ordinance was needed and that race-neutral measures employed by the City had not been helpful in preventing such discrimination. The Board adopted the 1998 version of the Ordinance, which was in effect at the time the instant complaints were filed.
The 1998 Ordinance provided for a bid discount program which required City departments to give specified discounts to contract bids submitted by certified WBE's or MBE's. (S.F.Admin.Code, §§ 12D.A.9(A)(2), 12D.A.5, 12D.A.6(b).) Additionally, it contained a subcontracting program requiring bidders for certain prime contracts to document their good-faith efforts to use MBE and WBE subcontractors. (Id., § 12D.A.17.) As summarized by the HRC director, the subcontracting program works this way: "`[B]idders for certain types of prime City contracts must demonstrate their good faith efforts to provide certified MBEs and WBEs an equal opportunity to compete for subcontracts. A bidder may comply with the Subcontracting Program by documenting its good faith efforts to inform MBEs and WBEs of subcontracting opportunities. Bidders who show that they plan to use MBE and WBE subcontractors at a level one would expect absent *786 discrimination need not document their good faith efforts.'"[3]
"Good-faith efforts" which a prime contractor must demonstrate to comply with the MBE/WBE participation goals include: identifying specific items on the project to be performed by MBE's/WBE's to provide participation opportunities by those entities; advertising for MBE's or WBE's in one or more newspapers, trade publications, minority-oriented publications or other media, not less than 10 calendar days before the bid submittal date; providing written notice of the contractor's interest in bidding on the contract to the number of MBE's or WBE's required to be notified by the project specifications; following up initial solicitations of interest by contacting potential MBE/WBE subcontractors to ascertain their interest; providing interested MBE's/WBE's with information about plans, specifications and requirements of the project; requesting assistance from minority and women community organizations, professional groups or business assistance offices to identify available MBE's and WBE's; negotiating in good faith with interested MBE's and WBE's and not rejecting bids unjustifiably; and advising and making efforts to assist interested MBE's/WBE's in obtaining bonds, credit or insurance. (S.F.Admin.Code, § 12D.A.5.)

3. The 2003 Ordinance

The 1998 Ordinance expired in 2003. Further investigation and public hearings followed, and in May 2003 the Board reauthorized the 1998 Ordinance, without substantial change.
The investigation included a 2003 disparity analysis conducted by HRC to assess the utilization of MBE's and WBE's in City contracting. This study revealed continued statistically significant underutilization of racial, ethnic, and nonminority women-owned businesses as prime contractors on various types of City projects. Additionally, there was. statistically relevant underutilization of such businesses at the subcontracting level. HRC also released a memorandum in 2003 relaying examples of departmental and subcontractor resistance to the commission's attempts to enforce the ordinance, as well as examples of noncompliance, including an example of a City staffer who manipulated a member of the selection panel to ensure that a certified firm received a low score and therefore would not be considered. Further, City staffers (1) would blame MBE/WBE prime contractors for project delays, knowing they were caused by non-MBE/WBE subcontractors; (2) impose unreasonably strict technical requirements (e.g., unnecessarily high number of years' experience), resulting in automatic exclusion of many MBE/WBE companies; and (3) routinely extend contracts rather than putting them out for a new bid, thus limiting opportunities for MBE/WBE firms.
The Board and the HRC conducted hearings in 2002-2003 at which 134 individuals testified. The general findings supporting the 2003 Ordinance describe the testimony as recounting "the discrimination minorities and women continue to face in City contracting and in obtaining contracts in the Bay Area that are not subject to affirmative action programs." For example, minority contractors spoke *787 of experiencing unfair scoring practices and indicated that a City official changed subcontracting rules and the scope of work to ensure exclusion of MBE's/WBE's from some contracting opportunities.
The record reviewed by the Board also exposed the ways in which prime contractors tried to circumvent compliance with the MBE/WBE ordinance. For example, MBE/WBE firms listed as subcontractors often receive little or none of the promised work; instead, work was performed by the prime contractor or another noncertified subcontractor. In one instance, once the subcontractor reached the allotted percentage as a subcontractor, her firm was immediately dropped from the job. Majority contractors have also refused to tender prompt payment for services of MBE's and WBE's.
Extensive legislative findings accompanied enactment of the 2003 ordinance, including that (1) the disproportionately small percentage of City contracts and subcontracts going to women and minority-owned businesses was due to discrimination by the City and discrimination in the private sector; (2) the City was actively discriminating against women and minority groups in its contracting, and was passively participating in private sector discrimination; (3) the City's contracting practices were in violation of federal law and therefore the Ordinance was required to bring the City into compliance with federal civil rights law; and (4) race- and gender-conscious remedial programs continued to be required to remedy discrimination against minority- and women-owned businesses in City contracting and subcontracting programs. The Board adopted the ordinance to "remedy the specifically identified City contracting practices and conditions in the Community and industries that cause the exclusion or reduction of contracting opportunities for minority- and women-owned businesses in City prime and subcontracting programs."

B. Procedural History

Coral challenged the Ordinance in 2001, seeking a writ of mandate compelling the City to implement race- and sex-neutral contracting policies and practices and directing it to cease implementing the 1998 Ordinance.[4] Coral also sought declaratory relief on the assertion that the bid discount and subcontracting programs facially violated section 31. The City successfully attacked Coral's standing in the trial court, but we reversed. (Coral I, supra, 116 Cal.App.4th at pp. 10, 28, 10 Cal.Rptr.3d 65.)
Meanwhile, in 2003 Schram filed a complaint for declaratory and injunctive relief, similarly alleging that the Ordinance facially violated section 31. Schram and the City filed cross-motions for summary judgment. The City presented volumes of evidence consisting primarily of the evidence the Board cited and relied upon in the preamble and findings to the 1998 and 2003 Ordinances.
While the summary judgment motions were pending, Coral I was remanded to the trial court and the two cases were consolidated by stipulation. All agreed that Coral would join Schram's motion and opposition, with no further briefing or record submissions.
Thereafter the trial court granted respondents' motion, denied the City's motion and entered judgment and permanent prohibitory injunction. This appeal followed.

*788 II. DISCUSSION

A. Standard of Review

The trial court must grant summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Both the denial and grant of a motion for summary judgment are subject to de novo review. (Edward Fineman Co. v. Superior Court (1998) 66 Cal.App.4th 1110, 1116, 78 Cal.Rptr.2d 478.) "As well, issues of statutory and constitutional interpretation raise pure questions of law, subject to independent appellate review. [Citation.]" (Slocum v. State Bd. of Equalization (2005) 134 Cal.App.4th 969, 974, 36 Cal. Rptr.3d 627.)

B. The Federal Funding Exception to Section 31 Does Not Save the Ordinance

There is a federal funding exception to section 31 that exempts certain enactments and actions from its reach. It states: "Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State." (§ 31, subd. (e).) The City presented undisputed evidence that several departments and agenciesincluding the Port of San Francisco and the San Francisco International Airport, Public Utilities Commission, Municipal Railway and Department of Public Works-receive funding from various federal agencies and that the granting agencies require its recipients to comply with title VI of the Civil Rights Act of 1964 (Civil Rights Act)[5] and the implementing regulations. The City is adamant that without the race- and gender-conscious measures set forth in the Ordinance, it will lose federal funding.
In detail, the City's argument is this: Receipt of all these federal funds is conditioned on compliance with 49 Code of Federal Regulations part 21 (2005). Pursuant to 49 Code of Federal Regulations part 21.5(c)(1) and (3), where the primary objective of the federal grant is to provide employment, or where the recipient has a record of discrimination, the recipient must meet the requirements of Executive Order No. 11246.[6] Because the City has a record of direct and passive discrimination, the Executive Order and regulations require it to "`develop and maintain an affirmative action program'" that includes race- and gender-conscious project participation goals, training opportunities and recruitment and outreach. (Citing 41 C.F.R. §§ 60-1.40, 60-4.2 & 60-4.3(7)(a)(p) (2004).) If the City fails to establish and maintain a program with these race-) and gender-conscious measures, "it could, among other things, lose FHWA [Federal Highway Administration] funding and the opportunity to obtain such funding in the future."
Respondents clarify that 49 Code of Federal Regulations part 21 sets forth regulations pertaining to the employment practices of the recipient (49 C.F.R. § 21.5(c)(1), (3)) or the recipient's contractor (41 C.F.R. § 60).[7] These provisions *789 are irrelevant because they do not govern contracting practices.
The City counters that its reference to employment regulations is a valid means "to ascertain the contours of [its] contracting obligations." The question here is not whether and how courts look to terms in the employment context to define standards in public contracting, but whether the Ordinance is necessary to maintain or establish eligibility for federal funds. (§ 31, subd. (e).)
The City also calls our attention to other regulations which it contends mandate implementation of race-conscious remedies. These include Department of Transportation regulations which provide: "This part does not prohibit the consideration of race, color, or national origin if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. Where prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program ..., the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage. Even in the absence of prior discriminatory practice or usage, a recipient in administering a program or activity to which this part applies, is expected to take affirmative action to assure that no person is excluded from participation in or denied the benefits of the program or activity on the grounds of race, color, or national origin." (49 C.F.R. § 21.5(b)(7) (2005).)
Likewise, the City refers to 40 Code of Federal Regulations part 7.35(a)(7), which contains a similar directive to recipients of assistance from the Environmental Protection Agency (EPA) to "take affirmative action to provide remedies to those who have been injured by the [past] discrimination."
The City maintains that these "take affirmative action" directives require recipients to remedy past discrimination with race-conscious programs. We disagree.
The first sentence of the Department of Transportation regulation quoted above permitsbut does not requirethe recipient *790 of federal funds to use race-based measures to remedy past discrimination. The second sentence imposes a duty to take affirmative action to remove the effects of such discrimination, but again it does not require that those measures be race-based. And finally, the last sentence embodies an expectation that recipients will pursue affirmative action to avoid discrimination by ensuring that minorities are not excluded from participating in applicable programs. Likewise, this provision is permissive in terms of the nature of the steps take, i.e. be they race-neutral or race-conscious. (C & C Construction, Inc. v. Sacramento Municipal Utility Dist. (2004) 122 Cal.App.4th 284, 308-309, 18 Cal.Rptr.3d 715 (C & C Construction).) We further point out that the Civil Rights Act contains an express provision generally limiting the preemptive effect of the act, as follows: "Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof." (42 U.S.C. § 2000h-4.) Section 31, with its categorical prohibition of discrimination in the operation of public employment, education' and contracting, is consistent with the intent of title VI of the Civil Rights Act to prevent recipients from discriminating on the basis of race, color or national origin in funded activities and programs.
Turning to the EPA regulation directing affirmative action to remedy the effects of past discrimination, we note that the language calls for specific targeting of remedies to those who have been injured by past discrimination. The Ordinance is not designed to pinpoint remedies to those suffering prior injuries and thus whether it remains in effect or not would not impact this directive. Moreover, the dictate itself prohibits a recipient from using "criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race ... or sex...." (40 C.F.R. § 7.35(b).)
It is the City's burden to bring forth "substantial evidence that it will lose federal funding if it does not use race-based measures and must narrowly tailor those measures to minimize race-based discrimination." (C & C Construction, supra, 122 Cal.App.4th at p. 298, 18 Cal.Rptr.3d 715.) And, if a particular federal regulation "expressly requires a state agency to use race-based measures to remedy past discrimination, the state agency must have substantial evidence of the type of past discrimination that triggers the federal regulation's requirement for current race-based measures. What facts, if present, require race-based remedial measures the factual predicate for race-based measuresmust be defined in the federal law or regulation, not by the state agency." (Id. at p. 299, 18 Cal.Rptr.3d 715.)
Here the record is devoid of evidence sufficient to rouse the federal funding exception to section 31. Where is the factual predicate showing the specific type of past discrimination that triggers a particular regulation's requirement for race-based remedial measures like the bid discount and subcontracting programs? The City's generalized arguments and statements are inadequate.

C. Ratification of the Race Convention Does Not Prompt Federal Preemption of Section 31

The United States Senate ratified the Race Convention in 1994 with the declaration *791 and reservation that the treaty would be implemented by the federal government to the extent of its jurisdiction over the matter and otherwise by the state and local governments. (Race Convention, Declaration and Reservations [as of Aug. 10, 2006]). Signatory nations to the Race Convention declared that they "condemn racial discrimination and undertake to pursue by all appropriate means and without delay a policy of eliminating racial discrimination in all its forms...." (Race Convention, pt. I, art. 2, ¶ 1; Gov. Code, § 8315, subd. (d)(1).) California implemented the Race Convention in 2003 pursuant to Government Code section 8315.
The supremacy clause of the United States Constitution announces the doctrine of federal preemption, including that "all treaties made ... under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl.2.) The question here is whether, as the City suggests, section 31 conflicts with, and therefore must yield to, the Race Convention. To answer this question we must construe the treaty's key terms and determine whether the Race Convention requires the use of race-conscious remedial measures, such as the City's bid preference and subcontracting programs.
The Race Convention defines "racial discrimination" as "any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life." (Race Convention, pt. I, art. 1, ¶ 1; Gov.Code, § 8315, subd. (b).) However, certain measures are not encompassed within this definition: "Special measures taken for the sole purpose of securing adequate advancement of certain racial or ethnic groups or individuals requiring such protection as may be necessary in order to ensure such groups or individuals equal enjoyment or exercise of human rights and fundamental freedoms shall not be deemed racial discrimination, provided, however, that such measures do not, as a consequence, lead to the maintenance of separate rights for different racial groups and that they shall not be continued after the objectives for which they were taken have been achieved." (Race Convention, pt. I, art. 1, ¶ 4; Gov.Code, § 8315, subd. (b).) Special measures shall be undertaken as follows: "States Parties shall, when the circumstances so warrant, take, in the social, economic, cultural and other fields, special and concrete measures to ensure the adequate development and protection of certain racial groups or individuals belonging to them, for the purpose of guaranteeing them the full and equal enjoyment of human rights and fundamental freedoms." (Race Convention, pt. I, art. 2, ¶ 2.)
Government Code section 8315 attempts to bring the definition of "discrimination" in section 31 in line with the definition of "discrimination" in the treaty. When enacting this provision, the Legislature found and declared that section 31 does not define "racial discrimination," that the absence of a definition has led to confusion and in order to clarify that confusion, "racial discrimination" as used in section 31 shall have the same meaning as contained in paragraphs 1 and 4 of the Race Convention, quoted above. (Stats.2003, ch. 211, § 1; Gov.Code, § 8315, subd. (a).)
*792 First, it is apparent that in attempting to synchronize these definitions, the Legislature overlooked Hi-Voltage Wire Works, Inc. v. City of San Jose (2000) 24 Cal.4th 537, 559-560, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (Hi-Voltage), wherein our Supreme Court rejected any specialized meaning of "discriminate" in favor of the dictionary meaning. As recently pointed out in C & C Construction, the Supreme Court is the final authority on interpretation of our state Constitution and therefore its definitionnot the Legislature'scontrols. (C & C Construction, supra, 122 Cal.App.4th at p. 302, 18 Cal.Rptr.3d 715, citing Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 902-903, 281 Cal.Rptr. 34, 809 P.2d 809.) In effect, the enactment of Government Code section 8315 amounted to a legislative attempt to amend the state Constitution without following the proper procedures for amendment. (C & C Construction, supra, at p. 302, 18 Cal.Rptr.3d 715.)
The City contends that the C & C Construction is wrong, reasoning that "the Legislature's power to enact Section 8315 does not arise under state law. Rather, in this instance, the California Legislature was acting pursuant to an express federal duty placed upon it by the United States Senate to execute a United States treaty within its" jurisdiction. Because the Legislature's power to act derived from federal rather that state law, it was superior to Proposition 209 and validly exercised without the need for a constitutional amendment." This argument blatantly ignores key government concepts like the separation of powers and the unique role of our judicial system. The Legislature was not operating on a clean slate because our Supreme Court had already interpreted section 31. The overturning of that constitutional interpretation must also take place within the court system, or by way of amendment to the Constitution. The Legislature's duty to respond to a federal treaty does not come fortified with federal superpowers enabling it to bypass the judicial and amendatory processes.
Alternatively, the City maintains that whether or not Government Code section 8315 is valid, federal preemption principles require us to favor the Race Convention's definition of discrimination over that of section 31, and thus evaluate the Ordinance under that treaty. This would be so if the two laws were in fatal conflict, but they are not.
The issue is not the basic definitions of discrimination in the treaty and the California Constitutionthey are comparable. Rather, the issue is whether the Race Convention's exclusion of "special measures" from its definition of discrimination, and its directive to signatory countries in part I, article 2, paragraph 2 to take such measures when warranted, create a conflict. In its report to the United Nations, the United States took note of the two "special measures" provisions and then construed them as follows: "Together, article 1(4) [`special measures' exclusion] and article 2(2) permit, but do not require, States parties to adopt race-based affirmative action programmes without violating the Convention. Deciding when such measures are in fact warranted is left to the discretion of each State party." (Reps. Submitted by State Parties Under Article 9 of the Convention, Com. on the Elimination of Racial Discrimination (CERD), CERD/C/351/Add.l, Oct. 10, 2000, Addendum, U.S.A., 11249, p. 60 (CERD Report).)[8] The CERD Report also noted *793 that "Proposition 209 ... prohibits the state from considering race or gender in state employment, public contracting or education programmes" and indicated that despite Proposition 209, the federal government has argued consistently that the Constitution and title VII of the Civil Rights Act allow for the narrowly tailored consideration of race in elementary and secondary school and university admissions. (CERD Rep., ¶¶ 268, 269, p. 64.) Significantly, the United States did not argue that the Constitution compelled race-conscious remedial measures.
In response, the CERD voiced concern with the United States' position "that the provisions of the [Race] Convention permit, but do not require States parties to adopt affirmative action measures to ensure the adequate development and protection of certain racial, ethnic or national groups. The Committee emphasizes that the adoption of special measures by States parties when the circumstances so warrant, such as in the case of persistent disparities, is an obligation stemming from article 2, paragraph 2, of the [Race] Convention." (Rep. of CERD, Gen. Assem. Off. Records, 56th Sess., Supp. No. 18 (A/56/18), 2001, ¶ 399, p. 71.)
CERD views the Race Convention as requiring adoption of race-based remedies in the face of persistent inequities while the State Department interprets the companion provisions as calling for a permissive approach. "Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty. [Citation.] (`Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.)'" (El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng (1999) 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576.) The State Department's interpretation is reasonable and accordingly we accord it great deference. Nothing in article 2, paragraph 2 requires that a particular type of "special and concrete measure[ ]" be utilized to remedy persistent discrimination. Indeed the plain meaning of the two provisions, read together, is that a state party is required to undertake some sort of special measures when "circumstances so warrant" in order to "ensure the adequate development and protection of certain racial groups" (Race Convention, pt. I, art. 2, ¶ 2); and to the extent such special measures would come within the normal definition of discrimination, those measures would not violate the Race Convention (id., pt. I, art. 1, ¶ 4). In other words the Race Convention does not mandate race-conscious special measures. Since section 31 can be reconciled with the Race Convention, it is not preempted by it.

D. The Trial Court Properly Rejected the City's Assault on Section 31 under the Seattle-Hunter Political Restructuring Doctrine

The City in its own motion for summary judgment took the position that section 31 cannot be applied constitutionally to prevent it from enacting remedial legislation to assist minorities and women.[9] Developing this argument, the City has invoked equal protection principles announced in Seattle and Hunter, in particular the idea that the Fourteenth Amendment extends to "`a political structure that treats all individuals as equals,' [citation], yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups *794 to achieve beneficial legislation." (Seattle, supra, 458 U.S. at p. 467, 102 S.Ct. 3187; see also Hunter, supra, 393 U.S. at pp. 390-391, 89 S.Ct. 557.) The trial court rebuffed this approach and denied the motion. We likewise conclude that section 31 does not implicate concerns under the political restructuring branch of federal equal protection jurisprudence.

1. Overview of Key Principles and Cases

In a nutshell, the Hunter/Seattle doctrine invokes the constitutional guarantee of equal protection to invalidate certain facially neutral enactments that explicitly alter the established political process with respect to a racial issue, thereby making it more onerous for racial minorities to achieve favorable legislation with respect to that issue. In other words, the equal protection clause will preclude laws that change the political landscape for racial reasons, or allocate governmental power to achieve an illicit, discriminatory purpose. (See Crawford v. Los Angeles Board of Education (1982) 458 U.S. 527, 541, 102 S.Ct. 3211, 73 L.Ed.2d 948 (Crawford).) As we explain, Hunter and Seattle expound the core concepts of the doctrine; Crawford exposes its reach.
The factual setting in Hunter harks back to 1964 when the Akron City Council enacted a fair housing ordinance to assure equal housing opportunities to all persons, regardless of race, color or creed. Nellie Hunter attempted to invoke the ordinance after being denied the opportunity to be shown houses on the for-sale list because she was African-American. Ms. Hunter's complaint was met with the response that the ordinance had been amended and no longer afforded her recourse. Indeed the electorate of Akron had amended the city charter to require that any fair housing ordinance enacted by the city council including the ordinance invoked by Ms. Hunterbe subjected to a referendum prior to taking effect. (Hunter, supra, 393 U.S. at p. 390, 89 S.Ct. 557.) All other ordinances, regulating real estate transactions became effective 30 days after enactment by the city council.
The Supreme Court struck down the city charter amendment on equal protection grounds. Although the amendment was facially neutral, the court was disturbed by the reality "that the law's impact falls on the minority." (Hunter, supra, 393 U.S. at p. 391, 89 S.Ct. 557.) The amendment placed a "special burden on racial minorities within the governmental process." (Ibid.) Holding that the amendment constituted "a real, substantial, and invidious denial of the equal protection of the laws" (id. at p. 393, 89 S.Ct. 557), the court reasoned that the government "may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." (Ibid.)
Finding support in Hunter, the court in Seattle invalidated a state initiative which forbade mandatory busing of public school pupils for purposes of racial integration. The court held that "despite [the initiative's] facial neutrality there is little doubt that the initiative was effectively drawn for racial purposes." (Seattle, supra, 458 U.S. at p. 471, 102 S.Ct. 3187.) In other words, the initiative was enacted because it would adversely effect busing for integration. (Ibid.) The court further concluded "that the practical effect of Initiative 350 is to work a reallocation of power of the kind condemned in Hunter. The initiative removes the authority to address a racial problemand only a racial problemfrom the existing decisionmaking body, in such a way as to burden minority interests.... *795 [T]he initiative expressly requires those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action." (Id. at p. 474,102 S.Ct. 3187.)
Thus it is apparent that a challenger relying on the Hunter and Seattle decisions would have to demonstrate that the particular law (1) employs a racial classification or has the purpose of adversely impacting racial minorities, and (2) alters the political landscape on a racial matter in a manner that places a special burden on racial minorities.
The reach of this doctrine was clarified in Crawford with the upholding of a California constitutional amendment (Proposition I) limiting state court-ordered school busing for desegregation purposes to those instances in which a federal court would order such a remedy to correct a violation of the federal equal protection clause. The court rejected the petitioner's contention that Proposition I embodied a racial classification and imposed a race-specific burden on racial minorities. "It neither says nor implies that persons are to be treated differently on account of their race." (Crawford, supra, 458 U.S. at p. 537, 102 S.Ct. 3211.) Further, the court explained that there was a distinction "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters. This distinction is implicit in the Court's repeated statement that the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place.... In sum, the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification." (Id. at pp. 538-539, 102 S.Ct. 3211.) However, where the purpose for repealing legislation is to disadvantage a racial minority, the repeal is unconstitutional. (Id. at p. 539, fn. 21, 102 S.Ct. 3211.)
Countering the argument that Proposition I fundamentally altered the judicial system by leaving those seeking relief from racial isolation in violation of state law with less than full judicial relief, the court clarified: "Nor can it be said that Proposition I distorts the political process for racial reasons or that it allocates governmental or judicial power on the basis of a discriminatory principle.... [¶] ... [H]aving gone beyond the requirements of the Federal Constitution, the State was free to return in part to the standard prevailing generally throughout the United States." (Crawford, supra, 458 U.S. at pp. 541-542, 102 S.Ct. 3211, fn. omitted.) In other words, it worked no impermissible distortion of the political process for the people to align the state's desegregation responsibilities and remedies with the standard set by the Fourteenth Amendment rather than the more protective standard repealed in part by Proposition I. The people can change their collective minds on state constitutional matters, so long as the result does not offend federal constitutional principles.
More recently, in Coalition for Economic Equity v. Wilson (9th Cir.1997) 122 F.3d 692, certiorari denied (1997) 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (Wilson), the Ninth Circuit decided the precise issue presented here, namely whether section 31 reallocates political power in a racially discriminatory manner such that women and racial minorities are denied equal treatment because section 31 prohibits enactment and implementation of legislation such as the Ordinance. (Id. at pp. 706-708.) Vacating the preliminary injunction that enjoined the state from executing or enforcing the "preferential treatment" *796 strand of section 31, the Wilson court concluded that the amendment did not work any constitutional injury. (Wilson, supra, at pp. 710-711.)[10][11] During the course of the opinion the court reviewed the Hunter/Seattle doctrine, characterizing the enactments under attack in the two cases as having "reallocated [political] authority in a racially discriminatory manner." (Id. at p. 706.) Drawing fuel from Crawford (id. at pp. 705-706), the court distinguished section 31, as follows: "When, in contrast, a state prohibits all its instruments from discriminating against or granting preferential treatment to anyone on the basis of race or gender, it has promulgated a law that addresses in neutral-fashion race-related and gender-related matters. It does not isolate race or gender antidiscrimination laws from any specific area over which the state has delegated authority to a local entity." (Wilson, supra, at p. 707.)

2. Analysis

The heart of this matter is whether an enactment such as section 31, on its face neutral and nonoffending of federal equal protection principles, nonetheless runs afoul of those principles when examined under the Hunter/Seattle/Hunter political restructuring doctrine. We conclude that it does not and that lodged under a Crawford analysis, section 31 survives this equal protection challenge.

a. No Impermissible Racial Classification or Racial Animus

A law may address a race-related matter, in neutral fashion, without embodying an invalid racial classification that discriminates on the basis of race. (Crawford, supra, 458 U.S. at p. 538, 102 S.Ct. 3211.) Thus, "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification." (Id. at p. 539, 102 S.Ct. 3211.) Or, as framed a little differently by the dissent in Seattle: "In the absence of a federal constitutional violation requiring race-specific remedies, a policy of strict racial neutrality by a State would violate no federal constitutional principle." (Seattle, supra, 458 U.S. at p. 491, 102 S.Ct. 3187, dis. opn. of Powell, J.)
Section 31 terminates the ability of racial minorities and women to obtain preferences in the operation of public education, public employment and public contracting. Although stated as positive law, it also operates as the functional equivalent of an enactment that repeals preferential race- or gender-related legislation not required by the federal equal protection clause. Read in its entirety with the savings clause,[12] section 31 is on footing similar to Proposition I, upheld in Crawford.[13] Section *797 31 embraces general principles of nondiscrimination, including the prohibition of favoring persons on the basis of race or gender, and can only be viewed as standing for the proposition that racial and gender discrimination, affirmative or reverse, is unfair and wrong.
Unlike the laws struck down in Hunter and Seattle, there is a constitutional symmetry to section 31. Its dual prohibition against discrimination and preferential treatment, coupled with the savings clause, propel section 31 into neutral territory that brooks no impermissible racial classification. Justice Mosk, in his concurring opinion in Hi-Voltage, expands eloquently on the interplay between these two strands, as he addresses the impact and import of section 31. So doing, he makes it clear that the amendment brooks no impermissible racial classification. We quote at length: "Stated negatively, section 31 prohibits governmental actors from improperly burdening or benefiting any individual or group in the operation of public employment, public education, or public contracting. The prohibition is not limited to barring such actors from improperly assigning burdens or benefits themselves. Rather, it extends to barring them from enabling, facilitating, encouraging, or requiring private parties to do so as well. For the operation of each of the indicated activities involves private parties as well as governmental actorsin other words, the operation of each entails the cooperation of both. One of section 31's purposes is to preclude any invidious barrier or privileged entrance to participation. [¶] Stated positively, section 31 commands governmental actors to treat all individuals and groups equally in the operation of public employment, public education, and public contracting. The command is not limited to compelling governmental actors to afford equal treatment themselves. Rather, it extends to compelling governmental actors to enable, facilitate, encourage, and require private parties to do so as well. Again, the operation of each of the indicated activities involves private parties as well as governmental actors, the operation of each entailing the cooperation of both. One of section 31's purposes is to remove all invidious barriers and privileged entrances to participation. [¶] Neither section 31's prohibition against the improper assigning of any burden or benefit in the operation of public employment, public education, or public contracting, nor its command of equal treatment therein, is limited solely to ends. Rather, both extend to means as well. Thus, one may not assign any burden or benefit improperly in an attempt to assign some other burden or benefit properly. Similarly, one may not afford treatment that in any respect is unequal in an attempt to afford treatment that in some other respect is equal. For section 31 at least, the end does not justify the means. Rather, means and end must each justify itself in light of section 31's prohibition and command." (Hi-Voltage, supra, 24 Cal.4th at pp. 570-571, 101 Cal. Rptr.2d 653, 12 P.3d 1068, cone. opn. of Mosk, J.)

b. No Impermissible Political Hurdle

It bears underscoring that the legislation passed in both Akron and Seattle *798 placed explicit procedural hurdles in the way of racial minorities' pursuit of antidiscrimination remedies: In Akron, a city charter amendment subjecting any fair housing ordinance enacted by the city council to a referendum; in Seattle, a statewide initiative which prohibited local school broads from mandating busing to achieve racial integration of the public schools. These enactments were not overt policy pronouncements. Rather, by sanctioning procedural changes that rigged the political process against racial minorities, the challenged laws impeded the efforts of racial minorities to secure protection against discrimination.
Although the Akron amendment was facially neutral, the legislation discriminated against racial minorities because it placed a special burden on them in their efforts to achieve antidiscrimination housing laws. (Hunter, supra, 393 U.S. at pp. 390-391, 89 S.Ct. 557.) Justice Harlan, concurring, cast the crux of the matter accurately when he said that Akron "has not attempted to allocate governmental power on the basis of any general principle. Here, we have a provision that has the clear purpose of making it more difficult for certain racial and religious minorities to achieve legislation that is in their interest." (Id. at p. 395, 89 S.Ct. 557.)
The Seattle court was more forthright in discerning the purpose of the challenged initiative, saying it was "beyond reasonable dispute" that the people enacted the initiative because of its adverse effects upon busing for integration. (Seattle, supra, 458 U.S. at p. 471, 102 S.Ct. 3187.) In other words, in both Hunter and Seattle there was an underlying, though not overtly stated, assumption that one had to but barely scratch the surface of the challenged law to expose its racially discriminatory purpose.[14][15] That purpose was to restructure the political process so that racial minorities would be impeded in achieving, respectively, antidiscrimination in housing and busing for integration of public schools.
Here, section 31 is a substantive policy enactment barring race- and gender-based discrimination and preferences in public employment, contracting and education. It is utopian in nature, seeking to ensure that public benefits are allocated in a color-blind and gender-blind fashion. Section *799 31 is a sweeping change in policy operating at the highest level of government. As our Supreme Court explained, "[t]he ballot argumentsfrom which we draw our historical perspectivemake clear that in approving Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, `to achieve equality of [public employment, education, and contracting] opportunities' [citation] and to remove 'barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification.' [Citation.]" (Hi-Voltage, supra, 24 Cal.4th at pp. 561-562, 101 Cal.Rptr.2d 653, 12 P.3d 1068.) In contrast, as the Seattle court articulated, "the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the racial nature of a decision to determine the decisionmaking process." (Seattle, supra, 458 U.S. at p. 470, 102 S.Ct. 3187.)
The effect of section 31 is to make it more difficult for any citizen to secure preferences on the basis of race or gender. On the assumption that in the future it is racial and ethnic minorities and women who would want to push for such preferences, short of prevailing in court they will have to launch a statewide initiative to do so.[16] (See Wilson, supra, 122 F.3d at p. 705, fn. omitted: "We accept without questioning the district court's findings that Proposition 209 burdens members of insular minorities within the majority that enacted it who otherwise would seek to obtain race-based and gender-based preferential treatment from local entities.") Poor people, veterans, owners of small businesses, persons with disabilities and others will not have to go this extra lap, but of course racial and ethnic minorities and women would be among the pool of poor people, veterans, small business owners, persons with disabilities and the like who might push for such preferences. In other words, the sway of section 31 commands that racial and ethnic minorities and women take their place alongside others, based on nonracial and nongender classifications, in their quest for preferences in the distribution of government contracts and public educational and employment opportunities. As a policy matter reasonable minds can hold differing viewpoints on the impact and wisdom of such a policy. However, if the policy itself does not discriminate on the basis of race or gender, and is not a pretext for discrimination but rather aims at advancing a discrimination-free society, how can it be said to violate federal equal protection principles? Under Crawford, the people are free to retreat from a more expansive and protective civil rights policy and return to a standard that conforms to the federal Constitution. (Crawford, supra, 458 U.S. at pp. 541-542, 102 S.Ct. 3211.) Under Crawford, it is clear that "even when a neutral law has a disproportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown." (Id. at pp. 537-538, 102 S.Ct. 3211, fn. omitted.)
*800 Moreover, as the Granholm court explained in its examination of the Hunter/Seattle line of cases, unlike Proposal 2 (and Proposition 209, the California prototype), the challenged enactments in those earlier cases "made it more difficult for minorities to obtain protection from discrimination through the political process...." (Granholm, supra, 473 F.3d at p. 251.) In contrast, Proposal 2 (and Proposition 209) "purport[l to make it more difficult for minorities to obtain racial preferences through the political process. These are fundamentally different concepts." (Ibid.; see also Wilson, supra, 122 F.3d at p. 708.) And, notwithstanding these fundamental differences, as we discuss in part II.E., post, if resort to racial or gender preferences is or becomes necessary as a corrective measure to rectify invidious discrimination, then section 31 must yield to the federal Constitution. Indeed, the savings clause of section 31 mandates submission to that higher law. (§ 31, subd. (h).) Construing section 31 as a whole as we must, we thus conclude that the constitutional amendment does not impermissibly restructure the political process in a manner that burdens the equal protection rights of racial and ethnic minorities and women.

E. The Trial Court Erred in Failing to Look at the Other Side of the Equation: Does the Federal Equal Protection Clause Mandate Race-conscious Legislation to Remedy Past Discrimination, Such That the Sway of Section 31's No-preferences Clause Must Yield to the Imperative of the Ordinance?

1. The City's Position and the Trial Court's Ruling

The City's stance on appeal is this: It has presented undisputed evidence documenting the ongoing race- and gender-based discrimination of its employees and prime contractors in the awarding of City contracts. The federal equal protection clause imposes an affirmative duty on the City to rectify this documented discrimination with continuation of the race- and gender-conscious programs set forth in the Ordinance. Applying section 31 to invalidate the Ordinance would preclude constitutionally mandated affirmative action programs, thereby impermissibly trumping the federal equal protection clause. Thus, respondents' challenge must fail.
The trial court ruled as follows: "The City argues that Hi-Voltage allows the City to act remedially when it has intentionally discriminated in the past. Hi-Voltage stated[:] `Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury.' [Citation.] The City states that its uncontested legislative findings, upon [which] the Ordinance is based, convert the Ordinance into a necessary, remedial measure. [¶] This Court does not find the City's reliance on its historical disparity study compelling. Although the Court does not dispute the accuracy of the City's study, it does not appear relevant in the context of this proceeding. The intent of the voters in adopting Proposition 209 was to outlaw race- and sex-based programs irrespective of the good will and moral position behind any particular program. The Ballot Pamphlet for Proposition 209 provides ample evidence that the voters acted with the intention to abolish any type of race- and sex-conscious program adopted by the City, regardless of its genesis. [Citation.] And nobody argues that Proposition 209 carved out an exception based on the concededly good intentions of the City when it created this remedial program."
*801 The trial court was correct on the matter of the voters' intent, and correct that Proposition 209 does not tolerate a "good intentions" caveat. However, it misunderstood the hierarchy of constitutional jurisprudence. The court's logic is flawed for two reasons. First, the issue was never whether section 31 could invalidate remedial efforts based on good intentions. The issue has always been whether the federal Constitution required the City to take the affirmative remedial steps set forth in the Ordinance in light of its assertion of pervasive past and ongoing discrimination. Second, the court assumed that section 31 is the last word. It is not. The federal equal protection clause is the last word. The court had no option but to engage in the appropriate analysis to determine whether the legislative history and supporting documents sustained the City's claim of discrimination in public contracting and, if so, whether the City had a constitutional obligation to remedy this history by implementing and administering the Ordinance.

2. Pertinent Constitutional Principles

The most sweeping pronouncements concerning the government's duty to eradicate discrimination have developed in the context of public school desegregation. Local school boards that operated state-compelled dual systems of education have been "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." (Green v. County School Board (1968) 391 U.S. 430, 437-438, 88 S.Ct. 1689, 20 L.Ed.2d 716 [holding, at pp. 438-442, 88 S.Ct. 1689, that school board's adoption of freedom-of-choice plan, 11 years after Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, did not sufficiently respond to this mandate].) Similarly, in Board of Education v. Swann (1971) 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586, the high court struck down an antibusing statute that absolutely forbade assignment of any student on account of race or for the purpose of creating a racial balance in the schools. Assessed against the backdrop of segregation, a state policy directing that school assignment plans be color blind hindered vindication of federal constitutional guarantees and rendered "illusory the promise of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems." (Board of Education v. Swann, supra, at p. 46, 91 S.Ct. 1284.)
In the context public contracting programs, the court has employed a strict scrutiny standard to evaluate the constitutionality of remedies, such as minority set-asides, that rely on racial classifications. This standard is grounded in the proposition that classifications based on race generally are inimical to a society whose institutions are founded on the principle of equality. (Wygant v. Jackson Board of Education (1986) 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d 260, plur. opn. of Powell, J.) Therefore, "`[r]acial and ethnic distinctions of any sort are inherently suspect and ... call for the most exacting judicial examination.'" (Ibid.) Any preference rooted in racial or ethnic criteria must be subject to "a most searching examination" to ensure constitutional compatibility. (Ibid.) This examination requires (1) that any racial classification "`be justified *802 by a compelling governmental interest'" and (2) that the means selected by the state to achieve its purpose "must be 'narrowly tailored to the achievement of that goal.'" (Id. at p. 274, 106 S.Ct. 1842.) Nonetheless, as the Supreme Court has recognized, "in order to remedy the effects of prior discrimination, it may be necessary to take race into account. As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy." (Id. at pp. 280-281, 106 S.Ct. 1842, plur. opn. of Powell, J., italics added.) Indeed, state actors have a "constitutional duty to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination." (Id. at p. 291, 106 S.Ct. 1842, cone. opn. of O'Connor, J.) Stated a little differently, "the State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." (Croson, supra, 488 U.S. at p. 518, 109 S.Ct. 706, cone. opn. of Kennedy, J.)
Croson is pertinent to this case because it, too, involved a challenge to a city public contracting plan that granted certain preferences to minority business enterprises. There, the court overturned the City of Richmond's minority set-aside program because it did not have a sufficient factual predicate to justify imposing a racially classified remedy. The court explained that "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." (Croson, supra, 488 U.S. at p. 498, 109 S.Ct. 706.) Moreover, "an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota." (Id. at p. 499, 109 S.Ct. 706.)
The court concluded that the predicate facts relied upon by the district court did not begin to approach "a prima facie case of a constitutional or statutory violation by anyone in the Richmond construction industry." (Croson, supra, 488 U.S. at p. 500, 109 S.Ct. 706.) Those "facts" included (1) the city council's designation of the plan as "`remedial'"; (2) "highly conclusionary" statements of several supporters of the plan that racial discrimination in the construction industry existed locally, in the state and around the country; (3) the disparity between the percent of prime contracts awarded to minority firms as compared with the minority population in the city; (4) the dearth of minority contractors within the membership of local contractors' associations; and (5) a prior congressional determination that there was nationwide discrimination in the construction industry. (Id. at pp. 499-504, 109 S.Ct. 706.) With respect to the third point, the court explained that when special qualifications are needed for a particular job, the relevant statistical pool for showing discriminatory exclusion is the number of minorities qualified to undertake the particular job, not the general population. (Id, at pp. 501-502, 109 S.Ct. 706.)
The court was also concerned that it was nearly impossible to determine whether the plan was narrowly tailored to remedy prior discrimination, since it was not linked to identified discrimination. The court criticized what appeared to be a lack of consideration of alternative, race-neutral ways to increase minority participation in city contracting. (Croson, supra, 488 U.S. at pp. 507-508, 109 S.Ct. 706.) Further, the quota rested on the faulty assumption that minorities would choose a particular trade in lockstep proportion to their representation in the city. (Id, at p. 508, 109 S.Ct. 706.)
*803 The court reiterated, however, that with the appropriate evidentiary support, a public entity could take action to dismantle a discriminatory, closed business system that excluded minority contractors. (Croson, supra, 488 U.S. at p. 509, 109 S.Ct. 706, plur. opn.) And, "[i]n the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." (Ibid.)
In Hi-Voltage our Supreme Court held that San Jose's program to encourage participation by minority and women business enterprises in public works projects violated section 31. (Hi-Voltage, supra, 24 Cal.4th at pp. 564-565, 101 Cal.Rptr.2d 653, 12 P.3d 1068.)[17] In reaching this conclusion the court also addressed the issue of whether and when some type of race-conscious remedy may be necessary in order for a city to discharge its duty under federal law to eradicate discrimination in public contracting: "`[T]he [United States Supreme] Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classification in order to remedy such discrimination.' [Citation.] Thus, the only constitutional obligation is the "`affirmative duty to desegregate'" [citations], also referred to as the duty to `disestablish' the results of intentional discrimination. [Citations.] Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury. [Citations.]" (Hi-Voltage, supra, 24 Cal.4th at p. 568, 101 Cal.Rptr.2d 653,12 P.3d 1068.)
If a city or other political subdivision were found to have engaged in intentional discrimination such that some type of race-based remedial program was necessary under the federal Constitution, the supremacy clause as well as section 31 dictate that federal law prevails: "If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section." (§ 31, subd. (h); see Hi-Voltage, supra, 24 Cal.4th at p. 569, 101 Cal.Rptr.2d 653, 12 P.3d 1068.)
The 1989 version of the Ordinance survived a Croson challenge. The federal district court (Associated General Contractors v. San Francisco (N.D.Cal.1990) 748 F.Supp. 1443, 1456) and the Ninth Circuit Court of Appeals (AGCC II, supra, 950 F.2d 1401, 1412-1418) both declined to enjoin the ordinance. And unlike the City of San Jose, here the City has argued vigorously that the record backing the current ordinance presents the extreme case that mandates a narrowly tailored racial preference program to root out intentional discrimination in public contracting in San Francisco.

III. CONCLUSION
Because the trial court declined to decide whether the City presented the extreme case of intentional discrimination in public contracting in San Francisco such that a narrowly tailored remedial preference program could be constitutionally required *804 (Hi-Voltage, supra, 24 Cal.4th at p. 568, 101 Cal.Rptr.2d 653, 12 P.3d 1068), the cause is remanded for the limited purpose of adjudicating this issue. In all other respects, the judgment is affirmed.
SEPULVEDA, J., concurs.
Concurring and Dissenting Opinion of RIVERA, J.
In my view, the majority opinion applied a truncated equal protection analysis and thereby reached the erroneous conclusion that California Constitution, article I, section 31 (section 31) does not offend federal constitutional principles. I would conclude that section 31 cannot escape the constitutional review required by Hunter v. Erickson (1969) 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (Hunter) and Washington v. Seattle School Dist. No. 1 (1982) 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (Seattle). With respect to that issue, I respectfully dissent and would reverse and remand the portion of the judgment that determined there was no facial equal protection violation.[1]
The majority readily acknowledges that the effect of section 31 is to create greater political obstacles for those seeking remedial race- and gender-based preferences as compared to those seeking preferences on other grounds (e.g., on the basis of wealth, poverty, disabilities, or age) in the arenas of public education, employment and contracting. (Maj. opn., ante, at p. 799.) Yet the majority concludes that because section 31 is facially neutral and is grounded in good intentions it does not violate equal protection. (Maj. opn., ante, at pp. 796-797, 799-800.)
Hunter and Seattle teach us, however, that even a facially neutral law can be discriminatory if it restructures political access in this wayby selectively burdening only "racially conscious legislation" because it "plainly `rests on "distinctions based on race."'" (Seattle, supra, 458 U.S. at p. 485, 102 S.Ct. 3187.) Therefore, in assessing the constitutionality of section 31, we must determine not only whether it is neutral or discriminatory in its articulated goals, but also whether the means chosen to accomplish those goals have the effect of violating the rights of minorities and women to participate fully in our political system. Because section 31 creates a two-tiered political structureone for minorities and women and one for all othersit is discriminatory. (Hunter, supra, 393 U.S. at pp. 390-393, 89 S.Ct. 557.)
In reaching this conclusion, I begin with a discussion of the basic principles to be. applied.[2]

I. "Political Structure" Equal Protection, or the Hunter-Seattle Doctrine

A. The Context
Traditionally, equal protection cases in the political context have challenged legislation that directly attacked the right to vote, such as the redrawing of boundaries *805 to exclude African-American voters (Gomillion v. Lightfoot (1960) 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110), or the reapportionment of districts in order to dilute voting power (Baker v. Carr (1962) 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Reynolds v. Sims (1964) 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (Reynolds); Avery v. Midland County (1968) 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (Avery)). These cases commonly are thought of as vindicating the right to vote guaranteed by the United States Constitution's Fifteenth Amendment, rather than its Fourteenth Amendment (Fourteenth Amendment) guarantees to equal protection. But in most of these cases the courts explicitly enforced not only the citizens' right to vote but also their right to be treated equally in the political process.[3]
Less well known in the arena of political process equal protection jurisprudence are the "political structure" cases. As has been noted, in these cases, the courts act to guard against a more subtle form of vote dilutionthe reallocation of political power in a way that treats all individuals equally, but operates to the disadvantage of minority groups and their interests. The majority opinion has touched on the three major cases in which the doctrine has been developed and demarcated. In my view, a more in-depth examination of the federal Supreme Court's explication of the doctrine, including a review of arguments made and rejected in those cases, will better inform our analysis of section 31. I therefore discuss each in detail.

B. Hunter
As the majority's opinion has already described, the voters of Akron, Ohio, repealed a fair housing ordinance and amended the city charter to require that "`[a]ny ordinance enacted by the Council of the City of Akron which regulates the use, sale, ... lease, sublease or financing of real property of any kind ... on the basis of race, color, religion, national origin or ancestry must first be approved by a majority of the electors ... at a regular or general election.'" (Hunter, supra, 393 U.S. at p. 387, 89 S.Ct. 557.)
The City of Akron defended the measure arguing that, unlike the initiative struck down in Reitman v. Mulkey (1967) 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830, which effectively prohibited the adoption of antidiscrimination ordinances, the charter amendment neither authorized nor encouraged housing discrimination and did not preclude the enactment of a new fair housing ordinance. (Hunter, supra, 393 U.S. at p. 389, 89 S.Ct. 557.) The Supreme Court disagreed, holding that the vice was not in the repeal of the antidiscrimination ordinance, but in requiring that "[o]nly laws to end housing discrimination based on `race, color, religion, national origin or ancestry' must run the ... gauntlet [of a referendum]" (id. at p. 390, 89 S.Ct. 557), thus placing "special burdens on racial minorities within the governmental process" (id. at p. 391, 89 S.Ct. 557). The amendment "not only suspended the operation of the existing ordinance forbidding housing discrimination, but also required the approval of the electors before any future ordinance could take effect. [The amendment] thus drew a distinction between those groups who sought the *806 law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends." (Id, at pp. 389-390, 89 S.Ct. 557.)
The fact that the amendment did not, on its face, discriminate against minority groups was not relevant to the court's analysis. "It is true" the Hunter court explained, "the section draws no distinction among racial and religious groups. Negroes and whites, Jews and Catholics are all subject to the same requirements if there is housing discrimination against them which they wish to end. But [the charter amendment] nevertheless disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor. The automatic referendum system does not reach housing discrimination on sexual or political grounds, or against those with children or dogs, nor does it affect tenants seeking more heat or better maintenance from landlords, nor those seeking rent control, urban renewal, public housing, or new building codes." (Hunter, supra, 393 U.S. at pp. 390-391, 89 S.Ct. 557.) Because the amendment placed "special burdens on racial minorities," it was subject to "the `most rigid scrutiny.'" (Id. at pp. 391-392, .89 S.Ct. 557.)
The U.S. Supreme Court was "unimpressed" with the city's various proffered justifications for the amendment, including its argument that the state is entitled to "distribute legislative power as it desires and that the people may retain for themselves the power over certain subjects...." (Hunter, supra, 393 U.S. at p. 392, 89 S.Ct. 557.) Acknowledging this to be true as a general matter, the court found that the principle nevertheless "furnish[ed] no justification for a legislative structure which otherwise would violate the Fourteenth Amendment.... The sovereignty of the people is itself subject to ... constitutional limitations...." (Ibid.)
The court concluded, "the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." (Hunter, supra, 393 U.S. at p. 393, 89 S.Ct. 557, citing Reynolds, supra, 377 U.S. 533, 84 S.Ct. 1362 & Avery, supra, 390 U.S. 474, 88 S.Ct. 1114.)[4]

C. Seattle
Seattle arose out of a mandatory pupil reassignment program instituted in Seattle to desegregate its schools, called the Seattle Plan. (Seattle, supra, 458 U.S. at p. 461, 102 S.Ct. 3187.) A group of Seattle residents formed an organization to oppose the plan. (Id. at pp. 461-162, 102 S.Ct. 3187.) The group first attempted to enjoin the Seattle Plan, and when that failed, it sponsored a statewide initiative "designed to terminate the use of mandatory busing for purposes of racial integration." (Id. at p. 462, 102 S.Ct. 3187.) The initiative prohibited any school district from requiring any student "`to attend a school other than the school which is geographically nearest or next nearest the student's place *807 of residence....'" (Ibid.) But the statute excepted from its prohibition pupil reassignments based upon special education requirements, health or safety hazards, physical barriers or obstacles between the student's residence and nearby schools, or unfitness of the neighborhood school due to "`overcrowding, unsafe conditions or lack of physical facilities.'" (Ibid.) The statute expressly prohibited the use of student assignment methods that had been part of Seattle's desegregation plan, such as redefinition of attendance zones, pairing of schools, and use of "`feeder'" schools. (Id. at pp. 462-463, 102 S.Ct. 3187.) A challenge to this statute ultimately made its way to the federal Supreme Court.
Building upon the principle enunciated in Hunter, the U.S. Supreme Court explained that the Fourteenth Amendment prohibits not only the outright denial of the franchise to racial or ethnic groups, but also prohibits a "`political structure that treats all individuals as equals,' [citation], yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." (Seattle, supra, 458 U.S. at p. 467, 102 S.Ct. 3187.)
Seattle's "simple but central principle" was this: "[L]aws structuring political institutions or allocating political power according to `neutral principles'such as the executive veto, or the typically burdensome requirements for amending state constitutionsare not subject to equal protection attack, though they may `make it more difficult for minorities to achieve favorable legislation.' [Citation.] Because such laws make it more difficult for every group in the community to enact comparable laws, they `provid[e] a just framework within which the diverse political groups in our society may fairly compete.' [Citation.] ... But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the racial nature of a decision to determine the decisionmaking process. State action of this kind ... `places special burdens on racial minorities within the governmental process,' [citation], thereby 'making it more difficult for certain racial ... minorities [than for other members of the community] to achieve legislation that is in their interest.' [Citation.] Such a structuring of the political process ... [is] 'no more permissible than [is] denying [members of a racial minority] the vote, on an equal basis with others.' [Citation.]" (Seattle, supra, 458 U.S. at pp. 469-470, 102 S.Ct. 3187.)
The Supreme Court found this principle to be "dispositive." (Seattle, supra, 458 U.S. at p. 470, 102 S.Ct. 3187.) "In our view, [the initiative] must fall because it does `not attemp[t] to allocate governmental power on the basis of any general principle.' [Citation.] Instead, it uses the racial nature of an issue to define the governmental decisionmaking structure, and thus imposes substantial and unique burdens on racial minorities." (Ibid.)
The court emphasized that a "`simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification.' [Citations.]" (Seattle, supra, 458 U.S. at p. 483, 102 S.Ct. 3187.) For example, had the Akron fair housing ordinance in Hunter merely been defeated by referendum, "`Negroes would undoubtedly [have lost] an important political battle, but they would not thereby [have been] denied equal protection.' [Citation.]" (Seattle, at p. 483, 102 S.Ct. 3187.) Similarly, the Washington initiative did not merely repeal the desegregation programs then extant, but also "burden[ed] all future attempts to integrate Washington schools in *808 districts throughout the State, by lodging decisionmaking authority over the question at a new and remote level of government. ... This imposes direct and undeniable burdens on minority interests. `If a governmental institution is to be fair, one group cannot always be expected to win,' [citation]; by the same token, one group cannot be subjected to a debilitating and often insurmountable disadvantage." (Id. at pp. 483-484, 102 S.Ct. 3187.)
The state argued that the statute contained no racial classificationthat it did not even mention "`race'" or "`integration' " but merely permitted busing for some purposes "while neutrally forbidding it for all other reasons." (Seattle, supra, 458 U.S. at p. 471, 102 S.Ct. 3187.) The court provided a twofold response. First, it rejected out of hand the state's claim that the law had no racial purpose. "Neither the initiative's sponsors, nor the District Court, nor the Court of Appeals had any difficulty perceiving the racial nature of the issue settled by [the initiative]." (Ibid.) Beyond that, the court observed the initiative's effect was to remove the local school board's authority to use pupil assignments to address a racial problem and only a racial problem. "In a very obvious sense" this disadvantages those who would benefit from pupil reassignment on racial grounds as compared to those who would benefit from pupil reassignment for any other purposes; this "work[s] a reallocation of power of the kind condemned in Hunter." (Id. at pp. 474-475,102 S.Ct. 3187.)
The state also argued that the initiative did not work any reallocation of power; after all, the state has ultimate authority over all of its school districts and is entitled to set educational policy on a state-wide basis. Therefore, the initiative "worked a simple change in policy rather than a forbidden reallocation of power." (Seattle, supra, 458 U.S. at pp. 475-476, 102 S.Ct. 3187.) Conceding the argument was superficially attractive, the court nonetheless soundly rejected it. While "States traditionally have been accorded the widest latitude in ordering their internal governmental processes," their ability to do so does not justify the creation of a legislative structure that violates the Fourteenth Amendment. (Seattle, at p. 476, 102 S.Ct. 3187.) "The issue here, after all, is not whether Washington has the authority to intervene in the affairs of local school boards; it is, rather, whether the State has exercised that authority in a manner consistent with the Equal Protection Clause." (Ibid.)
Finally, the state argued that Hunter had been effectively overruled by subsequent U.S. Supreme Court decisions. According to the state, because Hunter applied a simple "`disparate impact'" analysis its reasoning was "swept away, along with the disparate-impact approach to equal protection, in Washington v. Davis, 426 U.S. 229[, 96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), and Arlington Heights v. Metropolitan Housing Dev. Corp- 429 U.S. 252[, 97 S.Ct. 555, 50 L.Ed.2d 450] (1977) [Arlington]." (Seattle, supra, 458 U.S. at p. 484, 102 S.Ct. 3187.) While accepting the state's legal premisethat facially neutral legislation does not violate equal protection in the absence of discriminatory intent the court rejected the state's characterization of the initiative as neutral. "[W]hen the political process or the decision-making mechanism used to address racially conscious legislationand only such legislationis singled out for peculiar and disadvantageous treatment, the governmental action plainly `rests on "distinctions based on race."'" (Id. at pp. 484-485, 102 S.Ct. 3187.)

*809 D. Crawford
On the same day the "U.S. Supreme Court issued its opinion in Seattle it also decided Crawford v. Los Angeles Board of Education (1982) 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (Crawford). This decision helps to define the essential characteristics of suspect political restructuring by describing what it is not.
The historical setting of Crawford can be briefly summarized. In 1963 a group of minority students filed a class action against the Los Angeles Unified School District seeking desegregation of the schools. (Crawford, supra, 458 U.S. at pp. 529-530, 102 S.Ct. 3211.) After a trial, in 1970 the trial court determined the school was "substantially segregated in violation of the State and Federal Constitutions." (Id. at p. 530, 102 S.Ct. 3211.) The California Supreme Court affirmed, but relied only on the equal protection clause of the state's Constitution, holding that, in California, "`school boards ... bear a constitutional obligation to take reasonable steps to alleviate segregation in the public schools, whether the segregation be de facto or de jure in origin.' [Citation.]" (Id. at pp. 530-531, 102 S.Ct. 3211.) Thus, the California Supreme Court imposed upon California school districts a higher duty to desegregate than was required under the federal Constitution. (See Crawford v. Board of Education (1976) 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28.) Accordingly, on remand, a desegregation plan was approved by the court and implemented by the district in 1978. The plan included "substantial mandatory school reassignment and transportation`busing'on a racial and ethnic basis." (Crawford, supra, 458 U.S. at p. 531, 102 S.Ct. 3211.)
In November 1979 the voters of California ratified Proposition I, which amended the state Constitution, and "conform[ed] the power of state courts to order busing to that exercised by the federal courts under the Fourteenth Amendment." (Crawford, supra, 458 U.S. at pp. 531-532, 102 S.Ct. 3211.) Proposition I provided, in part, as follows: "`[N]o court of this state may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause....'" (Crawford, at p. 532, 102 S.Ct. 3211.) However, Proposition I did not "`prohibit the governing board of a school district from voluntarily continuing or commencing a school integration plan after the effective date of this subdivision as amended.'" (Crawford, at p. 532, fn. 6, 102 S.Ct. 3211.)
The petitioners in Crawford argued that Proposition I was unconstitutional because it "limit[ed] the power of state courts to enforce a state-created right to desegregated schools, [and thus created] a `dual court system' that discriminates on the basis of race. They emphasize[d] that other state-created rights may be vindicated by the state courts without limitation on remedies." (Crawford, supra, 458 U.S. at p. 536, 102 S.Ct. 3211.)
The U.S. Supreme Court acknowledged that if Proposition I had employed a racial classification it would be constitutionally suspect. (Crawford, supra, 458 U.S. at p. 536, 102 S.Ct. 3211.) But Proposition I did not embody a racial classification because "[i]t neither says nor implies that persons are to be treated differently on account of *810 their race. It simply forbids state courts to order pupil school assignment or transportation in the absence of a Fourteenth Amendment violation." (Id. at p. 537, 102 S.Ct. 3211.)[5]
There is a distinction, the court explained, between "state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters." (Crawford, supra, 458 U.S. at p. 538, 102 S.Ct. 3211.) Thus, the mere repeal of a state-mandated policy addressing a racial issue does not violate equal protection. A contrary rule would "limit seriously the authority of States to deal with the problems of our heterogeneous population[ and] States would be committed irrevocably to legislation that has proved unsuccessful or even harmful in practice." (Id. at pp. 539-540, 102 S.Ct. 3211.)
The petitioners in Crawford, then, made the only argument remaining to them that Proposition I was not a "mere repeal" but, like the enactment in Hunter, was a fundamental "alteration of] the judicial system so that `those seeking redress from racial isolation in violation of state law must be satisfied with less than full relief from a state court.'" (Crawford, supra, 458 U.S. at p. 540, 102 S.Ct. 3211.) Again, the court disagreed. The charter amendment in Hunter "involved more than a `mere repeal' of the fair housing ordinance" because in Hunter "persons seeking antidiscrimination housing lawspresumptively racial minoritieswere `singled out for mandatory referendums while no other group ... face[d] that obstacle.' [Citation.] By contrast, ... Proposition I is less than a `repeal' of the California Equal Protection Clause [because] after Proposition I, the State Constitution still places upon school boards a greater duty to desegregate than does the Fourteenth Amendment." (Crawford, at p. 541, 102 S.Ct. 3211, italics added.) Similarly, under Proposition Iunlike the initiative in Seattleracial minorities retained the right to seek desegregation plans from their local districts that included racial busing. Proposition I did not restructure the political or judicial process; it merely implemented the people's determination that "the standard of the Fourteenth Amendment was more appropriate for California courts to apply in desegregation cases than the standard repealed by Proposition I." (Crawford, at p. 542, 102 S.Ct. 3211, fn. omitted.)[6]
Thus, Proposition I differed from the Seattle and Hunter legislation in a critical respect. The Seattle initiative created "`distinctions based on race'" (Seattle, supra, 458 U.S. at p. 485, 102 S.Ct. 3187) by embedding racial busing prerogatives at the statewide level while leaving all other busing decisions to the school boards. The Hunter ordinance created distinctions based on race by subjecting *811 race- or religion-based fair housing laws to a referendum but permitting all other fair housing laws to be adopted by ordinance. (Hunter, supra, 393 U.S. at pp. 389-390, !8§ S.Ct. 557.) Proposition I, in contrast, was racially neutral because it forbade court-ordered busing not just for racial purposes, but for any purpose (in the absence of a federal constitutional violation) (Crawford, supra, 458 U.S. at p. 537, 102 S.Ct. 3211.), and so did not implicate "political structure" equal protection.

E. Summary and Application
The principles enunciated in Hunter, Seattle, and Crawford can be distilled to a simple formula: A law that "mere[ly] repeals]" legislation benefiting racial minorities, but does not reallocate political power (i.e., does not restrict future legislation), raises no constitutional red flags. (Hunter, supra, 393 U.S. at p. 390, fn. 5, 89 S.Ct. 557; Seattle, supra, 458 U.S. at p. 483, 102 S.Ct. 3187; Crawford, supra, 458 U.S. at p. 539, 102 S.Ct. 3211.) And a law that reallocates political power, but does so according to neutral principles, does not implicate "political structure" equal protection because it imposes the same political burdens on all who would seek beneficial legislation. (Crawford, supra, 458 U.S. at p. 537, 102 S.Ct. 3211; Seattle, supra, 458 U.S. at pp. 469-470, 102 S.Ct. 3187.) But a law that repeals existing beneficial legislation and reallocates power according to nonneutral principlesby making beneficial race-based legislation more difficult to achieve than similar legislation benefiting all othersis "`no more permissible than [is] denying [minorities] the vote, on an equal basis with others.'" (Seattle, supra, 458 U.S. at p. 470, 102 S.Ct. 3187.)
Applying this formula, one cannot escape the conclusion that section 31 violates equal protection. Section 31 repealed all preferences benefiting women and minorities in public employment, education and contracting. But it was not a "mere repeal." Section 31 also prohibited future race- and gender-based preferences. In order to accomplish that prohibition it altered the political landscape according to nonneutral principles. Section 31 moved to the most inaccessible political levela state constitutional amendmentthe adoption of race- and gender-based preferences. No other preferences-such as those favoring veterans, the elderly, the disabled or the economically disadvantaged-were so affected, and they continue to be available at any and all levels of government. In this way, like the amendment in Hunter and the initiative in Seattle, section 31 has placed a special political burden on minorities and women not imposed on others. It is therefore subject to "`the most rigid scrutiny.'" (Hunter, supra, 393 U.S. at pp. 391-392, 89 S.Ct. 557.)[7]
This case presents a concrete example. Under section 31, in the operation of its public contracting the City and County of San Francisco (City) can grant special benefits to locally-owned businesses (see, e.g., S.F.Admin.Code, ch. 6, § 6.4), to economically disadvantaged businesses (see, e.g., id., ch. 14A), or to any other individuals or affinity groups, such as veterans, seniors, or persons with disabilities, but the City cannot grant special benefits on the basis of race or gender (unless one of the narrowly drawn exceptions in section 31 can be shown to apply). Broadly stated, women and minorities seeking remedial race- or gender-based policies in San Francisco contracting practices must mount a statewide campaign to amend the California Constitution; any others seeking preferences in San Francisco contracting practices *812 e.g., based upon residency or economic statusneed only convince the board of supervisors to adopt an ordinance. Section 31 thus restructures the political process in a way that specifically and selectively burdens race- and gender-conscious legislation. It is therefore subject to strict scrutiny.[8]
Respondents, Coral Construction, Inc., and Schram Construction, Inc., (collectively respondents) contend the Hunter-Seattle doctrine does not apply to section 31. Theyand to a more limited extent, the majorityrely on the reasoning deployed in Coalition for Economic Equity v. Wilson (9th Cir.1997) 122 F.3d 692 (Wilson II). In my view, Wilson II is not faithful to the principles enunciated in Hunter and Seattle.[9] And because Wilson II is routinely cited as authority for the facial constitutionality of section 31, I turn now to a discussion of that decision.

II. The Wilson II Decision
I begin with a point of general agreement. For purposes of its analysis, the Ninth Circuit in Wilson II "accept[ed] without questioning the district court's findings that Proposition 209 burdens members of insular minorities ... who otherwise would seek to obtain race-based and gender-based preferential treatment from local entities." (Wilson II, supra, 122 F.3d at p. 705, fn. omitted.) This can hardly be disputed.
Section 31 was specifically designed to eliminate existing race- and gender-conscious affirmative action programs. Although section 31 also prohibits discrimination *813 based on race and gender, this provision added nothing to existing law. As the California Supreme Court stated, quoting Coalition for Economic Equity v. Wilson (N.D.Cal.1996) 946 F.Supp. 1480, 1489 (Wilson I), "`the people of California meant to do something more than simply restate existing law when they adopted Proposition 209.'" (Hi-Voltage Wire Works, Inc. v. City of San Jose (2000) 24 Cal.4th 537, 561, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (Hi-Voltage).) This "`something more'" is succinctly summarized in Chief Justice George's concurring and dissenting opinion in Hi-Voltage: "[An] overview of the ballot pamphlet materials relating to Proposition 209 makes several points clear. First, the measure's principal purpose clearly was to limit the types of affirmative action programs that governmental entities could employ in three areaspublic employment, public education, and public contracting. Second, the measure was not intended to preclude all governmental affirmative action programs within these areas, but rather was intended to prohibit only those affirmative action programs that discriminate against or grant preferential treatment to any individual or group on the basis of race or gender." (Id. at p. 587, 101 Cal.Rptr.2d 653, 12 P.3d 1068.)
Unquestionably, then, section 31 set a higher bar for achieving affirmative action legislation on behalf of women and minorities as compared to all others. Wilson II nonetheless concludes that section 31 does not effectuate a political restructuring at all, because it merely constitutes a proper exercise of state authority to prohibit all state instrumentalities from granting preferences on the basis of race or gender. (Wilson II, supra, 122 F.3d at pp. 706-707.) According to the Ninth Circuit, section 31's comprehensive scopeprohibiting "all race and gender preferences by state entities"effectuates nothing more nor less than the state's authority to vest in itself "`all decisionmaking authority'" (Wilson II, at p. 707, quoting Seattle, supra, 458 U.S. at p. 477, 102 S.Ct. 3187), and therefore it does not selectively redistribute political power (Wilson II, supra, 122 F.3d at p. 707).[10]
Here, the Ninth Circuit appears to have created out of whole cloth an exception to the Hunter-Seattle doctrine that would effectively negate the rule. Wilson II acknowledges that an isolated reallocation of political desegregative prerogatives is constitutionally suspect. (Wilson II, supra, 122 F.3d at p. 706.) Yet it insists that a statewide reallocation of political power with respect to racial and gender matters across multiple governmental arenas does no violence to equal protection. (Id. at p. 707.) Even apart from the fact that this argument was soundly rejected in Seattle, there is no principled analytical distinction between a narrow displacement of political access and a global one. My views on this point are synchronous with those of Judge Norris in his opinion respecting the denial *814 of rehearing en banc in Wilson II. Because I cannot improve upon his eloquent reasoning, I simply repeat it here.
The Hunter-Seattle doctrine holds that it works an injury upon minorities to subject them to a structural disadvantage in the political process. It therefore forbids the State from `differentiating] between the treatment of problems involving racial matters and that afforded other problems in the same area.' [Citation.] In Seattle, as the panel correctly observes, the State of Washington had inflicted this injury upon minorities at only one level of government: local school districts. What the panel suggests is that if the State inflicts a Hunter-Seattle injury at every level of representative government and `differentiates between the treatment of problems involving racial matters and that afforded other problems' in local school boards and city councils and the state legislature and state agencies such as the University of California Board of Regents, then the constitutional error is somehow cured. [Citation.] Neither Hunter nor Seattlenor common sense, for that mattersupports the Proposition that expanding the levels at which the State disadvantages minorities will render that action any less constitutionally suspect." (Wilson II, supra, 122 F.3d at p. 715 (dis. opn. of Norris, J., to denial of reh. en banc).)
The Ninth Circuit's secondary rationale for shielding section 31 from constitutional scrutiny rests on the assertion that "preferences" are not guaranteed under the Fourteenth Amendment and therefore they are not protected under the Fourteenth Amendment. According to Wilson II, section 31 does not even implicate the equal protection clause because it does not create "an impediment to protection against unequal treatment" but only "an impediment to receiving preferential treatment." (Wilson II, supra, 122 F.3d at p. 708.) "`[I]n the context of a Fourteenth Amendment challenge,'" the court reasoned, "`courts must bear in mind the difference between what the law permits, and what it requires.' [Citation.]" (Id, at p. 709.) Pointing out that the federal Constitution permits narrowly tailored affirmative action preferences only if justified by a compelling state interest, the court goes on to state: "To hold that a[n] ... affirmative action program is constitutionally permissible ... is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits. [¶] ... As in Crawford, `[i]t would be paradoxical to conclude that by adopting the Equal Protection Clause of the Fourteenth Amendment, the voters of the State thereby had violated it.'" (Wilson II, at p. 709.)
This reasoning is predicated upon two unstated assumptions, both of which are incorrect.[11]
First, the analysis assumes that section 31 and the equal protection clause are coextensive. They are not. True, the equal protection clause "barely permits" race- and gender-conscious remedial programs by requiring that they be both necessary and narrowly tailored to achieve a compelling interest. (Richmond v. J.A. Croson Co. (1989) 488 U.S. 469, 493-98, 109 S.Ct. 706, 102 L.Ed.2d 854.) But section 31 goes beyond this; it forbids not just discrimination but also narrowly-tailored preferences designed to eliminate discrimination. Thus, as one commentator *815 has argued, "[i]f the Equal Protection Clause does not prohibit the race and gender preferences barred by Proposition 209, compliance with the Equal Protection Clause cannot constitute a justification for Proposition 209's discriminatory invalidation of race and gender preferences." (Spann, Proposition 209 (1997) 47 Duke L.J. 187, 255.)
Second, and more fundamentally, the Wilson II analysis assumes that in "political structure" equal protection there is a pivotal distinction between what the Fourteenth Amendment "permits" and what it "requires." (Wilson II, supra, 122 F.3d at p. 709.) This notion is sui generis, and cannot be reconciled with Seattle. The race-based busing program in Seattle was not required under the Fourteenth Amendmentthe record clearly shows that the busing program was designed to remedy de facto, not de jure, segregation. (Seattle, supra, 458 U.S. at p. 460, 102 S.Ct. 3187 ["segregated housing patterns ... created racially imbalanced schools"]; see also Seattle School Dist. No. 1, etc. v. State (W.D.Wash.1979) 473 F.Supp. 996, 1001 [finding that the segregation was the result of housing patterns].) Yet this remedial programclearly a race-based preferencewas nevertheless entitled to the same constitutional protection that was afforded to the antidiscrimination laws in Hunter. (See also Nyquist, supra, 318 F.Supp. at p. 719 [rejecting the state's argument that Hunter does not apply to a law that restricts political access to desegregative busing because the state "has no constitutional obligation to end de facto racial imbalance"].)
It is critical to remember that "political structure" equal protection focuses not on the substance of the legislation, but on whether and how the legislation affects political access. The doctrine protects the right to lobby for any legislation that might be sought by a minority group "in its behalf (Hunter, supra, 393 U.S. at p. 393, 89 S.Ct. 557) or "`in [its] interest'" (Seattle, supra, 458 U.S. at p. 470, 102 S.Ct. 3187) and not just legislation securing rights guaranteed under the constitution.[12]
In sum, I cannot agree that the Ninth Circuit's analysis in Wilson II is a reliable application of the Hunter-Seattle doctrine. As has been explained, I would conclude that section 31 is subject to strict constitutional scrutiny. (Cone. & dis. opn, ante, at pp. 811-812.) My task, now, is to respond to specific points made in the majority opinion.

III. The Majority Opinion
The majority poses the core question in this way: "[A] challenger relying on the Hunter and Seattle decisions would have to demonstrate that the particular law (1) employs a racial classification or has the purpose of adversely impacting racial minorities, and (2) alters the political landscape on a racial matter in a manner that places a special burden on racial minorities." (Maj. opn., ante, at p. 795.) The opinion then concludes that section 31 employs no racial (or gender) classification, has no purposeful adverse impact on minorities, and places no special burdens on racial minorities or women not borne by others. (Id., at pp. 796-799.) These conclusions, however, are contradicted by the *816 majority's own determination that the dual purposes of section 31 were (1) to "repeal existing] preferential race- or gender-related legislation," and (2) to require that "racial and ethnic minorities and women who would want to push for such preferences [in the future], ... launch a statewide initiative to do so[, while p]oor people, veterans, owners of small businesses, persons with disabilities and others will not have to go this extra lap...." (Maj. opn., ante, at pp. 796, 799.)
This, of course, is precisely what the Hunter-Seattle doctrine forbids.
The majority takes issue with the notion that section 31 had as its purpose the creation of an unfair political structure; it seeks to distinguish the purpose of section 31 ["to ban discrimination and preferential treatment on the basis of race, ethnicity and gender"] from its effect ["to require racial and ethnic minorities and women to launch a statewide initiative in order to obtain such preferences" in the future]. The latter, the majority asserts, is merely a "potential impact" of the former. (Maj. opn., ante, at p. 799, fn. 16.) Thus, the majority supports its conclusion that section 31 should escape review under Hunter and Seattle by characterizing the political handicaps created by section 31 as merely unintended and inchoate consequences of the purposeful ban on preferences. But the cases contain no such purpose/effect dichotomy.
With respect to legislative purpose, section 31 is indistinguishable from the ban on busing in Seattle. The purpose of the Seattle initiative was to effectuate a ban on racial busing by local school districts in the future, just as the purpose of section 31 was to effectuate a ban on racial and gender preferences in public contracting, employment, and education in the future. It is self-evident that such bans on future action can only be achieved by some method of political restructuring, that is, by removing authority over the subject matter to a higher political level. To pass constitutional muster, this must be done in a racially neutral fashion. Accordingly; the question asked by "political structure" equal protection is not whether the purpose of the legislation was to create an unfair political structure, but whether the legislation created an unfair political structure. Neither Hunter nor Seattle hold, or even suggest, that an impermissible political restructuring evades constitutional review in the absence of language evincing a legislative intent to discriminate against minorities (and women) in the political process.
The-majority points to the fact that section 31 "itself does not discriminate on the basis of race or gender" (maj. opn., ante, at p. 799) because it places the same restrictions on every individualwhites and minorities, women and men (id., at p. 798.) As has been noted, however, this is not the focus of "political structure" equal protection. Indeed, it is a hallmark of this type of suspect legislation that it "`treats all individuals as equals'" while "subtly distorting] governmental processes" to the disadvantage of minorities. (Seattle, supra, 458 U.S. at p. 467, 102 S.Ct. 3187; and see Hunter, supra, 393 U.S. at pp. 390-391, 89 S.Ct. 557.) The laws under scrutiny in both Seattle and Hunter also did not create racial categories but placed the same restrictions on everyonewhites and minorities alike. The question was whether those laws nevertheless created a discriminatory political structure, which they did. In the same way, section 31 selectively burdens "[gender and] racially conscious legislation" and therefore "plainly `rests on "distinctions based on race"'" [and gender]." (Seattle, supra, 458 U.S. at p. 485, 102 S.Ct. 3187.)
*817 The majority opines that in Hunter and Seattle "there was an underlying, though not overtly stated, assumption that one had to but barely scratch the surface of the challenged law to expose its racially discriminatory purpose," a purpose purportedly absent in section 31. (Maj. opn., ante, at p. 798.) While I disagree that this unspoken rationale can be read into the majority opinions of Hunter or Seattle, it is of no moment. The Hunter-Seattle doctrine examines the intent and effect of legislation, not whether there was racial animus. If the law reallocates political power in a way that treats all individuals equally, but operates to the political disadvantage of minority groups and their intereststhat is, where there is "race-conscious restructuring of [the] decisionmaking process"the legislation is discriminatory, irrespective of the lawmakers' motivations. (Seattle, supra, 458 U.S. at pp. 470, 485-486 & fn. 29, 102 S.Ct. 3187.) This is true of section 31. However pure the voters' motives may have been in seeking to achieve the goal of nondiscrimination, their intent was clear: to prohibit only race- and gender-based affirmative action programs, and to enshrine that selective prohibition in our Constitution at the state's most inaccessible political level.
The majority suggests I have "move[d] the Hunter/Seattle doctrine too far afield from the core of equal protection jurisprudence" by "dismissing as irrelevant any reading of Hunter and Seattle that examines the context for, and gives credence to, a racially discriminatory purpose informing the challenged legislation." (Maj. opn., ante, at p. 798, fn. 15.) This overstates what was intended to be a narrow point, viz., that proof of invidious discriminatory intent is not a sine qua non of an equal protection violation in this context.[13] In fact, I would not disagree with the majority's view that the context and purpose of legislation can and should inform our analysis of it. Without belaboring the point, I would simply refer to the thoroughgoing analyses of section 31's ballot materials conducted by the court in Wilson I (Wilson I, supra, 946 F.Supp. at pp. 1493-1495) and by Chief Justice George in his concurring and dissenting opinion in Hi-Voltage, supra, 24 Cal.4th 537 at pages 582-587, 101 Cal.Rptr.2d 653, 12 P.3d 1068, which leave no doubt that section 31 was engendered not by opposition to all preferences, but by opposition to preferential treatment for racial minorities and women.[14] This is no different in kind from the motivations of those who opposed busing for racial purposes only in Seattle.
*818 The majority also attempts to distinguish section 31 from the laws in Hunter and Seattle based upon a procedural/substantive dichotomy. The majority declares, citing no authority, that the laws under scrutiny in Hunter and Seattle were not "overt policy pronouncements" but only "procedural changes that rigged the political process against racial minorities." (Maj. opn., ante, at p. 798.) The majority then characterizes section 31 as a "substantive policy enactment barring race- and gender-based ... preferences" (maj. opn., ante, at pp. 798-799) implying that, unlike the enactments in Hunter and Seattle, section 31 had no procedural component and was not intended to reallocate political power (maj. opn., ante, at pp. 797-800). But nothing in the Hunter or Seattle opinions even begins to suggest that the pieces of legislation under review in those cases enacted procedural changes only and were not also policy statements. It is difficult to imagine, for example, how a statewide initiative on the issue of busing could not be a policy enactment. Nor can it be said that section 31 is only a policy pronouncement. It is undisputed that section 31 also makes procedural changes that rig the political process against women and minorities, as did the legislation in Hunter and Seattle. (Maj. opn., ante, at p. 799.)
The majority concludes that section 31 is more akin to Proposition I, the anti-busing amendment at issue in Crawford, supra, 458 U.S. 527, 102 S.Ct. 3211. (Maj. opn., ante, at p. 796.) Describing Proposition I the majority states, "it worked no impermissible distortion of the political process for the people to align the state's desegregation responsibilities and remedies with the standard set by the Fourteenth Amendment rather than the more protective standard repealed in part by Proposition I. The people can change their collective minds on state constitutional matters, so long as the result does not offend federal constitutional principles." (Id. at p. 795.) True enough. But the majority's conclusion that section 31 is "on footing similar to Proposition I" (id. at p. 796) does not follow from the premise because, unlike Proposition I, section 31 does offend constitutional principles.
To begin with, in distinguishing Crawford from Seattle Justice Powell pointed out that after the adoption of Proposition I, "[t]he school districts themselves retain a state-law obligation to take reasonably feasible steps to desegregate, and they remain free to adopt reassignment and busing plans to effectuate desegregation. [H] [footnote] In this respect this case differs from the situation presented in [Seattle]." (Crawford, supra, 458 U.S. at pp. 535-536 & fn. 12, 102 S.Ct. 3211.) This also differentiates Proposition I from section 31; pursuant to the latter, state and local agencies do not remain free to adopt racial preferences to ameliorate racial discrimination.
But more to the point of our analysis is the simple fact that Proposition I did not use the "racial nature of an issue to define the governmental decisionmaking structure" (Seattle, supra, 458 U.S. at p. 470, 102 S.Ct. 3187)that is, it did not create a two-tiered political structure while section 31 does. Under Proposition I, pupil reassignment cannot be ordered as a judicial remedy for any purpose except to remedy a Fourteenth Amendment violation in accordance with federal standards. This constitutes a total prohibition, not one defined by race or gender. Thus, in the absence of a federal constitutional violation, Proposition I forbids court-ordered busing for any student seeking an advantageous reassignment, whether based on race, gender, special needs, sibling relationships, or any other distinction. Therefore, although it was reasonably foreseeable that Proposition I *819 would have a disproportionate impact on minoritiesa situation that requires a different equal protection analysis (see, e.g., Arlington, supra, 429 U.S. 252, 97 S.Ct. 555)it did not erect structural barriers peculiar to minorities nor place special limits on their political options, as does section 31.
The majority relies upon Justice Mosk's concurring opinion in Hi-Voltage, supra, 24 Cal.4th at pages 570-571, 101 Cal. Rptr.2d 653, 12 P.3d 1068, as showing that section 31 "brooks no impermissible racial classification." (Maj. opn., ante, at p. 797.) That reliance is misplaced. The concurrence addresses neither the issue of "racial classification]" nor any constitutional question. Rather, in addressing the City of San Jose's ordinance granting preferences in public contracting Justice Mosk merely explains that one cannot avoid the prohibitions of section 31 by using an improper means to achieve a proper end. (Hi-Voltage, supra, 24 Cal.4th at pp. 570-571, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (cone. opn. of Mosk, J.).) Moreoverand precisely because he was not addressing an equal protection issueJustice Mosk's shorthand characterization of the provisions of section 31 glosses over its critical feature. He writes: "Stated negatively, section 31 prohibits governmental actors from improperly burdening or benefiting any individual or group in the operation of public employment, public education or public contracting.... [¶] Stated positively, section 31 commands governmental actors to treat all individuals and groups equally in the operation of public employment, public education, and public contracting." (Hi-Voltage, at pp. 570-571, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (cone, opn. of Mosk, J.), italics added.) This clearly overstates the reach of section 31. Its provisions do not command governmental actors to treat all individuals and groups equally; nor do they prohibit government actors from improperly burdening or benefiting any individual or group. Section 31 prohibits only race- or gender-based burdens or benefits. Justice Mosk perhaps had reason to paint section 31 with overly broad strokes, but in doing so, he did not purport to supply any constitutional or equal protection analysis.
Finally, the fact that section 31 can be described as "utopian" in nature, that it "embraces general principles of nondiscrimination," and that it "can ... be viewed as standing for the proposition that racial and gender discrimination, affirmative or reverse, is unfair and wrong," (maj. opn., ante, at pp. 798, 796, 797) is irrelevant. In fairness, it should be noted that benign interpretations of section 31 and its particular type of color-blindness are not universally shared.[15] For example, a law prohibiting only race and gender preferences in state university admissionswhile allowing preferences for family lineage (legacies), athletic ability, wealth, special gifts, or even just connectionsmay reflect a *820 utopian or dystopian vision, depending on one's point of view.[16] But that is a political debate, not a judicial one. It is not for us to decide the normative issue of whether racial and gender preferences promote or undermine the goals of the Fourteenth Amendment. We decide only whether the enactment meets constitutional standards.
Judge Henderson's incisive remarks in Wilson I apply with equal force here: "It ... cannot be overemphasized that this case does not call upon this Court to adjudicate whether affirmative action is right or wrong, or whether it is no longer an appropriate policy for addressing the continuing effects of past and present discrimination against racial minorities and women. Such questions, while they are most certainly of vital public policy interest, lie beyond the purview of this Court. Nor does this case implicate the ability of governmental entities to voluntarily repeal affirmative action policies.... [¶] Rather, the substantive issues raised by this action are considerably more narrow, albeit no less important: whether the particular method chosen by Proposition 209 to curtail affirmative action is unlawful because it ... violates the rights of women and minorities to fully participate in our political system...." (Wilson I, supra, 946 F.Supp. at p. 1490.)

IV. Conclusion
I agree with the Ninth Circuit's observation that states have "`extraordinarily wide latitude'" in reserving or delegating political power. (Wilson II, supra, 122 F.3d at p. 706.) And no one questions the voters' authority to "resolve[ ] an issue at a higher level of state government." (Ibid.) But these actions must be accomplished by a method that conforms to equal protection principles. (Seattle, supra, 458 U.S. at p. 487, 102 S.Ct. 3187.)
I dissent from the majority opinion only insofar as it upholds the judgment of the trial court with respect to the constitutionality of section 31. I would reverse that portion of the judgment and remand for a determination of whether section 31 can be justified by a compelling state interest, and is narrowly tailored to do so.

APPENDIX TO CONCURRING AND DISSENTING OPINION

A. Articles that Argue Section 31 Violates Equal Protection
Goodman, Redacting Race in the Quest for Colorblind Justice: How Racial Privacy Legislation Subverts Antidiscrimination Laws (2004) 88 Marq. L.Rev. 299, 344 [the Wilson II court's statementthat a law does not classify by race if it prohibits classification by racemisses the point of the Hunter doctrine]
Strasser, Same-sex Marriage Referenda and the Constitution: On Hunter, Romer, and Electoral Process Guarantees (2001) 64 Alb. L.Rev. 949, 970-974 [Wilson II is "not persuasive" because it "overstated the case" and misrepresented the spirit of Hunter ]
Miller, "Democracy in Free Fall": The Use of Ballot Initiatives to Dismantle State-sponsored Affirmative Action Programs (1999) 1999 Ann. Surv. Am. L. 1, 36-37 & fn. 239 ["[Hunter and Romer] clearly stand for the proposition that when a minority of the population is deprived access, via ballot initiative, to governmental and political processes it had received through the legislative process, the Equal Protection Clause is violated. Proposition 209 ... eliminating state-sponsored affirmative action programs fall[s] within the scope of these precedents."]
Sealing, Proposition 209 as Proposition 14 (as Amendment 2): The Unremarked *821 Death of Political Structure Equal Protection (1999) 27 Cap.U. L.Rev. 337, 367-380 [Proposition 209, the charter amendment in Hunter, and the referendum in Seattle all "placed a structural impediment to fair access to the political process by those who would seek protection from discrimination; therefore, they violated the Equal Protection Clause"]
Pillai, Neutrality of the Equal Protection Clause (1999) 27 Hastings Const. L.Q. 89, 113-115 [section 31 is not neutral but contains "a facial classification based on race and gender" by singling out racial and gender preferences for prohibition and therefore is subject to strict scrutiny]
Vargas, Judicial Review of Initiatives and Referendums in Which Majorities Vote on Minorities' Democratic Citizenship (1999) 60 Ohio St. L.J. 399, 537-538 [Wilson II missed the point of Hunter-Seattle and Romer, which is that a majority cannot unfairly and unequally burden minorities' access to the political process]
Oppenheimer,[1]Carcieri's Self-described "Progressive" Critique of the ACLU on Proposition 209: A "Conservative" Response (1999) 39 Santa Clara L.Rev. 1153, 1165-1167 [Proposition 209 violates equal protection under the Hunter-Seattle doctrine]
Tokaji and Rosenbaum,[2]Promoting Equality by Protecting Local Power: A Neo-federalist Challenge to State Affirmative Action Bans (1999) 10 Stan. L.Rev. 129, 138-139 [Wilson II, "[w]hile purporting to apply the principle articulated by the Supreme Court, ... is irreconcilable with both the holding and the result of Seattle"]
Comment, Reassessing the Right of Equal Access to the Political Process: The Hunter Doctrine, Affirmative Action, and Proposition 209 (1999) 73 Tul. L.Rev. 1415, 1435-1440 [the dissenters in Wilson II and the district court in Wilson I more accurately interpreted and applied the Hunter doctrine to Proposition 209]
Note, Ruling by Numbers: Political Restructuring and the Reconsideration of Democratic Commitments after Romer v. Evans (1999) 109 Yale L.J. 587, 605-606, 622 [Wilson II failed to recognize and reconcile the holding in Romer in which the court "repudiated the notion that an act of political restructuring is neutral because the protections that it repeals are not constitutionally required"; Proposition 209 is subject to strict scrutiny under the long-established Hunter doctrine]
Amar, Recent Cases: The Equal Protection Challenge to Proposition 209 (1998) 5 Asian L.J. 323, 325-327 [Wilson II failed to follow U.S. Supreme Court precedent]
Note, Proposition 209: Does It Eliminate or Perpetuate Discrimination? The *822 Ninth Circuit Dismantles Affirmative Action in Coalition for Economic Equity v. Wilson (1998) 42 St. Louis U. L.J. 883, 912-914 [Wilson II incorrectly concluded Proposition 209 addressed race in a "`neutral fashion'" because the court looked only at the language of the amendment rather than its effect, which was to eliminate race- and gender-based affirmative action]
Spann, Proposition 209 (1997) 47 Duke L.J. 187, 242-256 [Wilson II incorrectly characterizes Proposition 209 as "neutral"; Proposition 209 categorically prohibits programs designed to end discrimination against minorities and women, and therefore is subject to strict scrutiny for the same reasons the affirmative action programs in Croson, supra, 488 U.S. 469, 109 S.Ct. 706 and Adarand Constructors, Inc. v. Peña (1995) 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 are subject to strict scrutiny]
Comment, A World Without Color: The California Civil Rights Initiative and the Future of Affirmative Action (1997) 38 Santa Clara L.Rev. 235, 263-265 [the Wilson II opinion ignores the central meaning behind the theory of equal protection and ignores the legal significance of Hunter and Seattle]
Margolis, Affirmative Action: Déjà Vu All Over Again? (1997) 27 Sw.U. L.Rev. 1, 60-62 [Wilson II used a flawed analysis by equating preferences with unequal treatment that is constitutionally prohibited]
Note, Gender Blindness and the Hunter Doctrine (1997) 107 Yale L.J. 261 [the Wilson II opinion rests on "questionable grounds"]
Amar and Caminker,[3]Equal Protection, Unequal Political Burdens, and the CCRI (1996) 23 Hastings Const. L.Q. 1019, 1045 ["[Proposition 209] embodies the kind of political process burden on the exercise of minority political power that the Hunter doctrine forbids"]

B. Articles that Argue Section 31 Does Not Violate Equal Protection
Carcieri, A Progressive Reply to Professor Oppenheimer on Proposition 209 (2000) 40 Santa Clara L.Rev. 1105, 1118-1121 [Proposition 209 does not violate equal protection because women and minorities are not constitutionally entitled to preferences]
Heriot,[4]Proposition 209 and the United States Constitution (1998) 43 Loyola L.Rev. 613, 623-634 [Proposition 209 is valid because it does not "explicitly restructure the political process," but instead, is a "substantive policy pronouncement banning state-sponsored racial and gender discrimination in public employment, public education and public contracting"]
Wood,[5]Does Decisional Law Grant Whites Fewer Political Rights Under the *823 Fourteenth Amendment Than It Grants to Racial Minorities? A Response to Vikram D. Amar and Evan H. Caminker (1997) 24 Hastings Const. L.Q. 969, 999-1000 [neither Seattle nor Hunter applies to Proposition 209 because it is a "pure policy enactment and does not explicitly alter the political decision making process on a racial question"]
Kmiec, The Abolition of Public Racial PreferenceAn Invitation to Private Racial Sensitivity (1997) 11 Notre Dame J.L. Ethics & Pub. Pol'y 1, 6-7 [Proposition 209 is valid because it has merely amended the California Constitution to be "expressly" color-blind]
Weeden, Affirmative Action California StyleProposition 209: The Right Message While Avoiding a Fatal Constitutional Attraction Because of Race and Sex (1997) 21 Seattle U. L.Rev. 281, 297-316 [Proposition 209 is valid because it does not contain a racial classification and had no discriminatory purpose]
NOTES
[1] The companies are Coral Construction, Inc. (Coral) and Schram Construction, Inc. (Schram) (collectively, respondents).

Appellants herein are the City and County of San Francisco; John L. Martin, in his official capacity as Director of the San Francisco International Airport; Henry E. Berman, Larry Mazzola, Michael S. Strunsky, Linda S. Crayton and Caryl Ito, in their official capacities as members of the Airport Commission of the City and County of San Francisco; and the San Francisco Public Utilities Commission (collectively, City). Coalition for Economic Equity has filed an amicus curiae brief on behalf of appellants in this appeal.
[2] Based on Hunter v. Erickson (1969) 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (Hunter ) and Washington v. Seattle School Dist. No. I (1982) 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (Seattle).
[3] Coral Construction, Inc. v. City and County of San Francisco (2004) 116 Cal.App.4th 6, 10, 10 Cal.Rptr.3d 65, footnote omitted (Coral I). The level of MBE/WBE subcontract work one would anticipate absent discrimination is set by the HRC director and staff. It is based on the subcontracting opportunities presented by the particular contract and the availability of certified MBE's and WBE's qualified to perform the type of work involved in the contract. (Ibid., fn. 2.)
[4] Although the 1998 Ordinance has expired, Coral's challenge is not moot because the 2003 Ordinance reenacted the 1998 law without significant change, based on new findings.
[5] Title VI of the Civil Rights Act states in part: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d.)
[6] 30 Federal Register 12319 (Sept. 24, 1965).
[7] As an example, 49 Code of Federal Regulations part 21.5(c)(1) (2005) is entitled "Employment practices" and provides in part:

"(1) Where a primary objective of the Federal financial assistance to a program ... is to provide employment, a recipient ... shall not ... subject a person to discrimination on the ground of race, color, or national origin in its employment practices ... [and] shall take affirmative action to insure that applicants are employed, and employees are treated during employment, without regard to their race, color, or national origin." (Italics added.)
Similarly, subdivision (c)(3) provides that where the primary aim of federal assistance is not to provide employment, but nonetheless "discrimination on the grounds of race, color, or national origin in the employment practices of the recipient ... tends, on the grounds of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the provisions of paragraph (c)(1) of this section shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries." (49 C.F.R. § 21.5(c)(3), italics added.)
41 Code of Federal Regulations part 60-4 (2005) sets forth affirmative action requirements for construction contractors and applies to "all of a construction contractor's or subcontractor's construction employees...." (Id., § 60-4.1) Part 60-4.2(d) concerns construction contractors and refers to male and female participation goals as a percentage "for the Contractor's aggregate workforce in each trade ..." (Italics added.)
[8] The CERD Report was prepared by the United States Department of State. (CERD Rep., ¶ 2, p. 3.)
[9] Although the City sprinkles this argument with "as applied" language, the heart of this matter is whether section 31 is a valid enactment, a matter more squarely resolved as a facial challenge to the constitutionality of section 31.
[10] While Wilson would be considered persuasive authority, it is not binding on state courts. (Walker v. Kiousis (2001) 93 Cal. App.4th 1432, 1441, 114 Cal.Rptr.2d 69.) A number of courts have referred to Wilson with approval. (See Hi-Voltage, supra, 24 Cal.4th at p. 561, 101 Cal.Rptr.2d 653, 12 P.3d 1068; Kidd v. State of California (1998) 62 Cal.App.4th 386, 408-410, 72 Cal.Rptr.2d 758.) However, these cases do not resolve the constitutionality of section 31 under the Hunter/Seattle doctrine. That is for us to decide.
[11] See also Coalition to Defend Affirmative Action v. Granholm (6th Cir.2006) 473 F.3d 237, 250-251 (Granholm), in which the Sixth Circuit also rejected a similar equal protection challenge to Michigan's Proposition 2, a statewide ballot initiative modeled after California's Proposition 209.
[12] The savings clause provides that if any part is "found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit." (§31, subd. (h).)
[13] It is true that Proposition I was less than a repeal of our state equal protection clause because it retained in local school boards certain more expansive desegretative powers. However, that the voters did not choose to conform to the federal Constitution in all respects, but only receded part way, was irrelevant to the analysis in Crawford. "In short, having gone beyond the requirements of the Federal Constitution, the State was free to return in part to the standard prevailing generally throughout the United States. It could have conformed its law to the Federal Constitution in every respect." (Crawford, supra, 458 U.S. at p. 542, 102 S.Ct. 3211, italics added.)
[14] The Seattle court was well aware that the Akron measure failed as a direct attempt to legitimize a right to discriminate in real estate transactions on the basis of race. (Hunter, supra, 393 U.S. at pp. 388-389, 89 S.Ct. at pp. 559-560.) Two years before deciding Hunter, the high court had invalidated a California statewide initiative which prohibited the state from denying private property owners the right to decline to sell or lease their real property to such persons as they, in their absolute discretion, chose. (Reitman v. Mulkey (1967) 387 U.S. 369, 380-381, 87 S.Ct. 1627, 18 L.Ed.2d 830.) In Reitman, the court had no trouble spotting the state's involvement in private racial discrimination where the intent and effect of the initiative was to authorize racial discrimination in the housing market.
[15] By dismissing as irrelevant any reading of Hunter and Seattle that examines the context for, and gives credence to, a racially discriminatory purpose informing the challenged legislation, the dissent moves the Hunter/Seattle doctrine too far afield from the core of equal protection jurisprudence. It is, after all, 'purposeful discrimination'" that offends the Fourteenth Amendment, "for the `central purpose of the Equal Protection Clause ... is the prevention of official conduct discriminating on the basis of race.' [Citation.]" (Seattle, supra, 458 U.S. at p. 484, 102 S.Ct. 3187.) Ultimately in both Seattle and Hunter, any distinction between the impact of the legislation and the legislative purpose to discriminate on the basis of race merge: No one reasonably could say that the impact in those cases was an unintended consequence of the legislation. Rather, the impactdiscrimination on the basis of race-was the purpose.
[16] The dissent mischaracterizes this sentence as constituting our "determination" that one of the "dual purposes" of section 31 is to require racial and ethnic minorities and women to launch a statewide initiative in order to obtain such preferences. (Dis. opn., post, at pp. 815-816.) The purpose of section 31 is to ban discrimination and preferential treatment on the basis of race, ethnicity and gender in the operation of public employment, education and contracting. To state the obvious, once such preferences are banned, those impacted would have to take steps to undo the ban should they desire to do so. A potential impact is not the same thing as the legislative purpose.
[17] Significantly, unlike the current situation, the City of San Jose conceded that its program was not constitutionally required. (Id. at p. 568, 101 Cal.Rptr.2d 653, 12 P.3d 1068.) Moreover, its disparity study was not part of the record, and thus the court had no way to measure the fit between the remedy and the goal of eliminating the disparity. (Id. at p. 569, 101 Cal.Rptr.2d 653, 12 P.3d 1068.)
[1] As noted in the majority opinion's introduction, section 31 was adopted by the voters' approval of Proposition 209 (maj. opn., ante, at p. 783); accordingly, section 31 will occasionally be referred to as Proposition 209. As the majority opinion also notes, the appeal focuses on the portion of section 31 that prohibits race- and gender-based preferences. (Maj. opn., ante, at pp. 783-784.) In referring to section 31,1 also address that disputed provision.
[2] Because the enactments at issue in Hunter and Seattle raised only issues of racial discrimination, this discussion of "political structure" equal protection will often be couched in terms of the impact on "minorities." The analysis, however, would apply equally to laws, like section 31, that create a political structure that disadvantages women.
[3] For example, in Avery, the court stated: "When the State apportions its legislature, it must have due regard for the Equal Protection Clause. Similarly, when the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process." (Avery, supra, 390 U.S. at p. 480, 88 S.Ct. 1114.)
[4] The following year the principle enunciated in Hunter was applied to invalidate a statute that prohibited school desegregation by means of pupil reassignments unless implemented by an elected school board. (Lee v. Nyquist (W.D.N.Y.1970) 318 F.Supp. 710, 712-713, 720 (Nyquist) ["The ... [legislature has acted to make it more difficult for racial minorities to achieve goals that are in their interest. The statute thus operates to disadvantage a minority, a racial minority, in the political process."].)
[5] The court also recognized that, under conventional equal protection analysis, a facially neutral legislative act with discriminatory intent would be constitutionally suspect, and that evidence of a disproportionate impact of the act on racial minorities could indicate such a motivation. But the court found no such evidence in Crawford. (Crawford, supra, 458 U.S. at p. 544, 102 S.Ct. 3211.)
[6] In his concurrence, Justice Blackmun provided a slightly different analysis. Proposition I did not change the political structure of the decisionmaking process, he wrote, because "[s]tate courts do riot create the rights they enforce." (Crawford, supra, 458 U.S. at p. 546, 102 S.Ct. 3211 (cone. opn. of Blackmun, J.).) The courts merely enforce rights that are created elsewherein the legislature, in local ordinances or in the constitution itself. Because Proposition I removed a remedy only from the courts and did not remove access to any legislative source of "rights," the political process was not affected at all. (Ibid.)
[7] The pertinent legal literature I have located and reviewed overwhelmingly supports this conclusion. (See Appendix to Concurring and Dissenting Opinion, post.)
[8] As the majority points out, in the "extreme case of intentional discrimination" (maj. opn., ante, at p. 803) race- or gender-based preferences may be required by the federal Constitution and section 31 has a savings clause excepting such cases (maj. opn., at pp. 801-803). This does not, however, save section 31 from constitutional scrutiny, as the majority seems to imply. (Maj. opn, ante, at p. 800.) First, it is far from clear whether all race- and gender-based preferences that are permitted by the equal protection clause are also required. (See, e.g., Grutter v. Bollinger (2003) 539 U.S. 306, 327-333, 123 S.Ct. 2325, 156 L.Ed.2d 304 [holds that a law school's use of race as a factor for admissions was constitutionally justified, but does not state that it is constitutionally required].) But even if all preferences that survive strict scrutiny were required under equal protection, the unequal political structure created by section 31 is itself a matter subject to constitutional review. While the savings clause would be relevant in determining whether section 31 is narrowly tailored to achieve its goal, it is no substitute for a proper constitutional inquiry requiring, as a threshold matter, demonstration of a compelling state interest.
[9] Indeed, in a comment on the denial of rehearing en banc in Wilson II, Judge Hawkins of the Ninth Circuit implies that the panel in Wilson II was reading tea leaves rather than hewing closely to precedent (Wilson II, supra, 122 F.3d at pp. 717-718), thus offering one possible explanation for the result in that case. Certainly, it has been argued that the Hunter-Seattle doctrine would not survive if it arrived on the U.S. Supreme Court's doorstep today. (See, e.g., Bell, California's Proposition 209: A Temporary Diversion on the Road to Racial Disaster (1997) 30 Loyola L.A. L.Rev. 1447, 1454-1459.) On the other hand, the jurisprudential underpinnings of Hunter-Seattle have been strongly embraced in other contexts. (See, e.g., Romer v. Evans (1996) 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855["[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense"].) We, of course, leave to the commentators any speculation about how the high court would treat the question. Our role, as an inferior court, is to make an honest and forthright application of existing precedent. "[I]t is not our role to predicthowever accurate our predictions might turn out to be." (Wilson II, supra, 122 F.3d at p. 718 (com. of Hawkins, J., on denial of reh. en banc) citing Rodriguez de Quijas v. Shearson/Am. Exp. (1989) 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526.)
[10] In so holding, the Wilson II court pieces together truncated quotes from the Seattle decision to create the impression that the holding in Seattle excludes from its purview any legislation effectuating pervasive, statewide policies on racial matters, as distinguished from isolated changes such as occurred in Hunter and in Seattle. (Wilson II, supra, 122 F.3d at pp. 706-707.) Seattle contains no such exclusion. Indeed, it makes clear that while the state retains full authority to adopt legislation which removes local prerogatives, it can only do so in conformance with equal protection requirements. (Seattle, supra, 458 U.S. at p. 480, fn. 23, 102 S.Ct. 3187["[i]t is ... clear, as we have noted at several points in our opinion, that the State remains free to vest all decisionmaking power in state officials, or to remove authority from local [entities] in a race-neutral manner (italics added) ].)
[11] The Wilson II analysis also seems decidedly asymmetrical: Under its reasoning, preferences designed to eliminate racial discrimination are properly subject to strict scrutiny while a blanket prohibition on the same remedial programs gets a constitutional "pass." (Wilson, supra, 122 F.3d at p. 709.)
[12] In Coalition to Defend Affirmative Action v. Granholm (6th Cir.2006) 473 F.3d 237, the court was led astray by Wilson II's faulty analysis. Granholm agreed with Wilson II's conclusion that "`[i]mpediments to preferential treatment do not deny equal protection.' (Granholm, at p. 250, citing Wilson II, supra, 122 F.3d at p. 708.) The majority in this case also incorrectly finds meaning in the distinction between forbidding discrimination and forbidding preferences. (Maj. opn., ante, at p. 800.)
[13] As is explained in Seattle, the United States Supreme Court has "not insisted on a particularized inquiry into motivation in all equal protection cases: `A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.' [Citation.]" (Seattle, supra, 458 U.S. at p. 485, 102 S.Ct. 3187, italics added.) A political restructuring along racial linesalthough engendered by a facially neutral lawcreates just such a classification. "[W]hen the political process or the decisionmaking mechanism used to address racially conscious legislationand only such legislationis singled out for peculiar and disadvantageous treatment, the governmental action plainly `rests on "distinctions based on race."` [Citation.]" (Id. at pp. 485-486, 102 S.Ct. 3187.)
[14] One of the ballot arguments for section 31 makes this point emphatically. "`REVERSE DISCRIMINATION' BASED ON RACE OR GENDER IS JUST PLAIN WRONG!.... [Sic] [S]tudents are being rejected from public universities because of their RACE. Job applicants are turned away because their RACE does not meet some `goal' or `timetable.' Contracts are awarded to high bidders because they are of the preferred RACE.... Proposition 209 will stop [these] terrible programs...." (Wilson I, supra, 946 F.Supp. at p. 1494.)
[15] See, e.g., Note, Proposition 209: Does It Eliminate or Perpetuate Discrimination? The Ninth Circuit Dismantles Affirmative Action in Coalition for Economic Equity v. Wilson (1998) 42 St. Louis U. L.J. 883, 885 ["[w]hile Proposition 209 purports to reinforce antidiscrimination legislation, opponents of the initiative argue that the amendment, as applied, only prohibits discrimination against whites in that it targets affirmative action programs that solely benefit African-Americans and other minorities, even though such programs have been deemed necessary to remedy the present effects of past discrimination"]; López, Colorblind to the Reality of Race in America, The Chronicle of Higher Education (Nov. 3, 2006) p. B6 ["[w]e find ourselves now in the midst of a racial era marked by what 1 term `colorblind white dominance.' in which a public consensus committed to formal antiracism deters effective remediation of racial inequality, protecting the racial status quo while insulating new forms of racism and xenophobia"].
[16] Comment, A World Without Color: The California Civil Rights Initiative and the Future of Affirmative Action (1997) 38 Santa Clara L.Rev. 235, 265.
[1] Oppenheimer authored a brief on behalf of amici curiae the American Jewish Congress and the National Council of Churches arguing for an affirmance of Wilson I. (Wilson II. supra, 122 F.3d at pp. 695-696; see Oppenheimer, Carcieri's Self-described "Progressive" Critique of the ACLU on Proposition 209: A "Conservative" Response (1999) 39 Santa Clara L.Rev. 1153, fn. *.)
[2] The authors were part of the team of attorneys representing plaintiffs in the Wilson case. (Wilson I, supra, 946 F.Supp. at p. 1487; Wilson II, supra, 122 F.3d at p. 695; see Tokaji & Rosenbaum, Promoting Equality by Protecting Local Power: A Neo-federalist Challenge to State Affirmative Action Bans (1999) 10 Stan. L.Rev. 129, 143, fn. 1 (Tokaji & Rosenbaum).)
[3] The authors were part of a team of attorneys representing plaintiffs in Wilson I. (Wilson I, supra, 946 F.Supp. at p. 1487; see Tokaji & Rosenbaum, supra, 10 Stan. L.Rev. at pp. 129, 143, fn. 1.)
[4] The author cochaired the Yes on Proposition 209 campaign. (Heriot, Proposition 209 and the United States Constitution (1998) 43 Loyola L.Rev. 613, fn. a1.)
[5] Wood was the co-author and coproponent of Proposition 209, and is a coprincipal in Californians Against Discrimination and Preferences, which was a defendant intervener in Wilson. (Wood, Does Decisional Law Grant Whites Fewer Political Rights Under the Fourteenth Amendment Than It Grants to Racial Minorities? A Response to Vikram D. Amar and Evan H. Caminker (1997) 24 Hastings Const. L.Q. 969, fn. *.)